Paul R. PARKER, Petitioner *v.* Sharon PRIEST, In Her Official Capacity of Secretary of State of the State of Arkansas, Respondent; Gerald J. Crochet, Jr., Intervenor; Craig Douglass, On Behalf of Arkansans for Amendment 4, Intervenor; Elizabeth Farris, et al., On Behalf of Give Hot Springs the Right to Vote Committee, Intervenors

96-779                                              930 S.W.2d 322

Supreme Court of Arkansas
Opinion delivered September 30, 1996
[Petition for rehearing denied October 21, 1996.]

*Wright & Burke*, by: *William Randal Wright*, for petitioner.

*Winston Bryant*, Att'y Gen., by: *Kay J. Jackson DeMailly*, Asst. Att'y Gen., for respondent.

Intervenor *Gerald J. Crochet, Jr.*, pro se.

*Friday, Eldredge & Clark*, by: *James M. Simpson* and *Walter M. Ebel III*, for intervenor Craig Douglass.

*Richard L. Henry*, for intervenors Elizabeth Farris, et al.

DONALD L. CORBIN, Justice. Petitioner, Paul R. Parker, and Intervenor, Gerald J. Crochet, Jr., ask us to enjoin Respondent, Secretary of State Sharon Priest, from placing proposed Amendment 4 to the Arkansas Constitution on the ballot for the general

election to be held November 5, 1996. Petitioner requests that if the election ballots are printed before this court has a chance to rule on the petition, we enjoin Respondent from counting and canvassing the votes cast with respect to the proposed Amendment 4. We allowed the intervention of two additional parties in this original action, which was filed pursuant to Amendment 7 to the Arkansas Constitution of 1874: Craig Douglass on behalf of "Arkansans For Amendment 4," the sponsors of the proposed amendment, and Elizabeth Farris and others on behalf of "Give Hot Springs the Right to Vote Committee." Petitioner and Intervenor Crochet challenge both the ballot title and the popular name of the proposed amendment. We find no merit to their challenges and deny the petition and request for injunctive relief.

On June 12, 1996, Respondent certified as sufficient the popular name and ballot title of the proposed Amendment 4. As certified by both Respondent and the Arkansas Attorney General, the popular name of the proposed amendment reads as follows:

> AN AMENDMENT TO ESTABLISH A STATE LOTTERY; TO PERMIT CHARITABLE BINGO GAMES AND RAFFLES CONDUCTED BY NONPROFIT ORGANIZATIONS; AND TO ALLOW VOTERS IN HOT SPRINGS TO DECIDE WHETHER OR NOT TO AUTHORIZE CASINO GAMBLING AT OR ADJACENT TO THE OAKLAWN RACETRACK AND AT TWO OTHER CASINO ESTABLISHMENTS IN HOT SPRINGS LOCATED AT SITES TO BE APPROVED BY THE GOVERNING BODY OF HOT SPRINGS

The complete text of the ballot title as certified by both Respondent and the Arkansas Attorney General is appended to this opinion. Relevant portions of the ballot title are reproduced as needed in our discussion below. Petitioner filed this original action on July 3, 1996. We granted Intervenor Douglass's motion to expedite this case on September 9, 1996, and heard oral argument on September 23, 1996.

### ORIGINAL ACTION PETITION

Petitioner initiated this original action by filing a petition in this court pursuant to Amendment 7 to the Arkansas Constitution of 1874 and Ark. Sup. Ct. R. 6-5. In his petition, Petitioner raises five points for injunctive relief, arguing that the popular name and

ballot title are insufficient and misleading because: (1) there is no definition of "state lottery;" (2) there is no geographical location for "voters in Hot Springs;" (3) they are unclear as to whether one or two issues will be decided in the Hot Springs local election on the location of casino gambling; (4) voters will not be able to ascertain in the five minutes they are allotted in the voting booth that the purpose of the proposed amendment is to give Oaklawn Racetrack a constitutionally sanctioned monopoly on for-profit gambling; and (5) they are lengthy, complex, and confusing as they relate to casino gambling. In oral argument, Petitioner's counsel abandoned the first two of these points. The third point is raised in Intervenor Crochet's brief and is addressed below. The last two points are raised in Petitioner's brief and will be addressed below.

In his supporting brief, Petitioner's challenge has four grounds as to the ballot title only: (1) the ballot title is not sufficient to enable a voter to make an intelligent decision as to whether to vote for or against the proposed law; (2) the length, design, and complexity of the ballot title will prevent the voter from comprehending what choice he is being asked to make in the time allotted a voter; (3) the design of the ballot title does not enable the voter to comprehend the consequences of voting to approve the proposal as it applies to casino gambling and pari-mutuel wagering at Oaklawn Racetrack; and (4) the ballot title does not uphold the very purpose of the initiative process.

Intervenor Crochet raises the following four challenges to the ballot title in his brief: (1) the ballot title sets a date certain for commencement of casino gambling at Oaklawn, but does not disclose whether and when casino gambling will commence at the other two casinos; (2) the ballot title does not inform voters that Oaklawn Racetrack is the only pari-mutuel franchisee in Hot Springs; (3) the ballot title misleads voters into thinking more than three casinos will be authorized — an unlimited number at or adjacent to Oaklawn and two elsewhere; and (4) the ballot title does not inform voters of a significant change in the law that it would allegedly achieve — changing the source of the right to conduct dog racing from statutory law to constitutional law. We consider all arguments separately below.

## STANDARD OF REVIEW
## SUFFICIENCY OF POPULAR NAME AND BALLOT TITLE

██ The popular name is primarily a useful legislative device that need not contain the same detailed information or include exceptions that might be required of a ballot title. *Chaney* v. *Bryant,* 259 Ark. 294, 532 S.W.2d 741 (1976) (citing *Pafford* v. *Hall,* 217 Ark. 734, 233 S.W.2d 72 (1950)). Ballot titles must include an impartial summary of the proposed amendment that will give voters a fair understanding of the issues presented and of the scope and significance of the proposed changes in the law; they cannot omit material information that would give the voter serious ground for reflection; they must be free from misleading tendencies that, whether by amplification, omission, or fallacy, thwart a fair understanding of the issues presented. *Bailey* v. *McCuen,* 318 Ark. 277, 884 S.W.2d 938 (1994); *Christian Civic Action Comm.* v. *McCuen,* 318 Ark. 241, 884 S.W.2d 605 (1994). The popular name is to be considered with the ballot title in determining its sufficiency. *Moore* v. *Hall,* 229 Ark. 411, 316 S.W.2d 207 (1958).

██ It is axiomatic that the majority of voters will derive their information about a proposed measure from the ballot title immediately before exercising the right of suffrage. *Christian Civic Action Comm.*, 318 Ark. 241, 884 S.W.2d 605. Thus, it is this court's duty and responsibility to ensure that when that right of suffrage is exercised as to a proposed amendment to our state's constitution, the voters are allowed to make an intelligent choice, fully aware of the consequences of their vote. *Id.*

### PETITIONER'S BRIEF
### I. INSUFFICIENT TO ENABLE VOTER TO MAKE INTELLIGENT DECISION

██ Here, Petitioner makes no specific allegation of insufficiency of the ballot title; he does not identify any specific language as misleading or omitted. Rather, Petitioner merely makes a conclusory allegation that the ballot title is insufficient, cites the applicable standard for our review, and identifies the issue before us as whether the voter, while in the voting booth, will be able to make an intelligent decision as to whether to vote for or against the proposed amendment based on the ballot title alone. Petitioner does not make a legal argument in support of this point, and we will not address the bare allegation any further. *Williams* v. *State,* 325 Ark.

432, 930 S.W.2d 297 (1996).

## II. LENGTH, COMPLEXITY, AND DESIGN

Petitioner acknowledges that the length of a ballot title alone is not a sufficient basis to invalidate it, but contends that length becomes a critical factor when combined with other factors. Specifically, Petitioner contends that the length and manner in which this ballot title is written places before the voter several considerations such as whether to approve four types of gambling not currently authorized by Arkansas law[1] and the various taxes and distribution of revenues associated with each. Consequently, Petitioner argues that the length, design, and complexity of this ballot title cannot be read and comprehended in the five minutes a voter is permitted to remain in the voting booth pursuant to Arkansas Code Annotated § 7-5-522 (Repl. 1993) and that the ballot title therefore does not adequately inform the voter of the changes in the law that he is asked to make.

When previously considering a proposed amendment with objectives similar to the current one, this court quoted its earlier statement to the effect that while neither length nor complexity of the ballot title should be a controlling factor, they are considerations in determining whether a voter can make an intelligent decision based on the ballot title. *Christian Civic Action Comm.*, 318 Ark. 241, 247, 884 S.W.2d 605, 608 (quoting *Dust v. Riviere*, 277 Ark. 1, 6, 638 S.W.2d 663, 666 (1982)). This court concluded in *Christian Civic Action Committee* that the ballot title had a fatal misleading tendency due to the combination of its length of 709 words, its use of specialized terminology that obscured meaning, and its artful amplifications and omissions that concealed the proposed amendment's potential effect. *See id.* at 250, 884 S.W.2d at 610.

In considering Petitioner's argument, we find it significant that he does not suggest that the language of the ballot title misrepresents the text of the proposed amendment or that any material language is omitted from the ballot title. Rather, he contends that the voter will be confused by the presence of multiple considera-

---

[1] Petitioner identifies the four types of gambling as (1) a state-owned lottery, (2) bingo games and raffles, (3) casino gambling at or adjacent to Oaklawn Racetrack, and (4) casino gambling at two other locations in Hot Springs.

tions in the ballot title, specifically the consideration of four types of gambling along with the considerations that each form of gambling has a different taxation formula with nonuniform distribution of revenues generated.

According to Petitioner, the length of the entire ballot title at issue here is 482 words. The portions of the ballot title relevant to this argument are as follows:

> A PROPOSED AMENDMENT TO THE ARKANSAS CONSTITUTION TO ESTABLISH A STATE-OWNED LOTTERY, TO BE REGULATED BY THE GENERAL ASSEMBLY; REQUIRING ALL STATE LOTTERY PROCEEDS, LESS EXPENSES AND PRIZES, TO BE APPROPRIATED AS FOLLOWS: 50% FOR LAW EN-FORCEMENT, AND 50% TO LOCAL PUBLIC SCHOOL DISTRICTS (ALLOCATED BY AVERAGE DAILY ATTENDANCE); . . . PROVIDING BINGO GAMES AND RAFFLES MAY BE CONDUCTED FOR CHARITABLE PURPOSES BY NONPROFIT ORGA-NIZATIONS, AND SHALL BE REGULATED BY THE GENERAL ASSEMBLY; PROVIDING IF AUTHOR-IZED BY VOTERS IN THE CITY OF HOT SPRINGS, CASINO GAMBLING SHALL BE LAWFUL . . . IN HOT SPRINGS . . . REQUIRING THE GENERAL ASSEM-BLY TO LEVY A PRIVILEGE TAX ON CASINO OP-ERATORS OF 14% TO 18% OF NET CASINO GAM-BLING REVENUES; PROHIBITING OTHER SPECIAL TAXES OR FEES WITH RESPECT TO CA-SINO GAMBLING OR RELATED ACTIVITIES; AL-LOCATING SUCH PRIVILEGE TAX 85% TO THE STATE, 10% TO HOT SPRINGS, AND 5% TO GAR-LAND COUNTY[.]

The ballot title accurately summarizes the text of the proposed amendment with respect to each type of gambling au-thorized and the respective distribution of proceeds and tax reve-nues. There is nothing so complex about this ballot title that a voter could not understand. The language is plain and organized in a coherent manner with the respective provisions relating to proceeds and revenue distributions following each type of gambling author-ized. We find that no material omissions have been made and that the ballot title is not misleading so as to thwart a fair understanding

of these issues. Likewise, we find the ballot title is not so complex as to be beyond the voter's comprehension. Although for purposes of reviewing the particulars of this argument the foregoing quotation shortens the ballot title considerably, we find the total length of 482 words to be of no consequence, especially when considered in light of the absence of any misleading tendencies.

We note that some of the specific terminology used in this ballot title was tacitly approved in *Christian Civic Action Committee,* 318 Ark. 241, 248, 884 S.W.2d 605, 609, where this court stated that most voters could readily understand the use of words such as "state lottery," "charitable bingo and raffles," and "pari-mutuel wagering." It was, among other things, the use of the words "additional racetrack wagering" to mean casino-style gambling that created the misleading tendency in that case. The current ballot title clearly refers to casino gambling as casino gambling.

■ In short, we are unwilling to hold this ballot title misleading simply because it presents multiple considerations to the voters. Our duty is to ensure that those considerations are presented to the voters in an impartial ballot title so that voters can make intelligent choices. *Dust,* 277 Ark. 1, 638 S.W.2d 663. We are convinced that such has been done in this case.

### III. MONOPOLY ON CASINO GAMBLING AND PARI-MUTUEL WAGERING

■ Petitioner contends that the primary purpose in the design of the ballot title is to disguise the true focus of the proposed amendment — casino gambling at Oaklawn Racetrack. While it is not disputed that Oaklawn Racetrack supports this proposed amendment, Petitioner offers no evidence that casino gambling at Oaklawn is the "true focus" of the proposal. To the contrary, we find no merit to this contention since the proposal also establishes a state lottery, charitable bingo and raffles, and casino gambling at two sites in Hot Springs other than Oaklawn Racetrack. Moreover, the ballot title is very clear in its terms that casino gambling will be authorized "at or adjacent to Oaklawn Racetrack." Thus, even if this were the "true focus" of the proposal, it is clearly disclosed in the ballot title and popular name.

Petitioner contends further that the effect of the proposed amendment is to grant the pari-mutuel franchisee at Oaklawn Racetrack a constitutionally sanctioned monopoly inasmuch as it

will be the only entity to provide both pari-mutuel wagering and casino gambling in Hot Springs. Even assuming *arguendo* that the proposed amendment will achieve the effect Petitioner alleges it will, that effect is clearly stated in the ballot title for the reasons expressed below in addressing Intervenor Crochet's second point. Additionally, to call the combination of two types of gambling a "monopoly" is a stretch of that word's definition when four types of gambling would actually be legalized if the proposal passes: state-owned lottery, charitable bingo and raffles, casino gambling, and pari-mutuel wagering.

### IV. PURPOSE OF INITIATIVE PROCESS

Petitioner contends that, as used by the drafters of the proposed amendment, the initiative power reserved by the people in Amendment 7 to the Arkansas Constitution of 1874 will be manipulated to promote the financial gain of a few. Petitioner argues that the proposed amendment will thereby defeat the purpose of the initiative process, which is, Petitioner contends, to permit the people to exercise some control over the policies of this state. Conversely, the responsive argument is that the initiative process is undermined when a few persons act to prevent the voters from receiving the opportunity to exercise their votes.

Initially, we perceive at least three purposes of the proposed amendment: (1) to establish a state-owned lottery; (2) to establish charitable bingo and raffles; and (3) to establish casino gambling at three locations in Hot Springs. Thus, it is questionable whether the sole benefit of this proposal would be the financial gain of a few.

There can be no doubt that the power reserved to the people in the Initiative and Referendum Amendment, Amendment 7 to the Arkansas Constitution of 1874, is a cornerstone of our state's democratic government. When considering the Initiative and Referendum Amendment, this court has said, "the voters of this state essentially have, within constitutional limits, a right to change any law or any provision of our Constitution they deem appropriate through Amendment 7 to the Constitution." *Dust*, 277 Ark. at 4, 638 S.W.2d at 665. That is indeed the purpose of the initiative process. It follows that this court's sole function in such a process is to ensure that the ballot title represents the proposed amendment in an honest, impartial, and intelligible manner. *Bradley v. Hall*, 220 Ark. 925, 251 S.W.2d 470 (1952). It is not our function

to express our view on, or to determine the merits of, a proposed measure — that power is expressly reserved to the people. The purpose of the initiative process is not undermined by the presentation to the voters of an issue that directly benefits a relative few of the people so long as the benefits to the few were not concealed from the voters. Once the initiated proposal is put to a vote, the people then have their say — they may either accept or reject the proposal with a majority vote. The initiative process is not undermined when the people vote on an issue that was presented to them in a fair and intelligible manner.

As evidence that the ballot title manipulates the initiative process, Petitioner contends that it is designed so that easily understood concepts appear at the beginning, with the more complex concepts appearing near the end. Counsel for Intervenor Douglass explained during oral argument that, although the proposal was not drafted in any particular order, there was a decision to place the lottery first due to the current prohibition of lotteries in our constitution, art. 19, § 14, Ark. Const. of 1874. We find nothing misleading about this decision given our state's historical constitutional prohibition of lotteries since statehood. *See Christian Civic Action Comm.*, 318 Ark. at 254, 884 S.W.2d at 612 (Dudley, J., dissenting). Finally, we note that this argument is nothing more than a repeat of Petitioner's Point II, which we have already rejected.

### INTERVENOR CROCHET'S BRIEF
### I. DATES CASINO GAMBLING WILL BEGIN

Intervenor Crochet contends that the proposed amendment provides a date certain and immediate upon which casino gambling will be begin at Oaklawn Racetrack, but does not provide a date certain upon which casino gambling will begin at the other two casinos, or if casino gambling will begin there at all. Intervenor Crochet argues that the ballot title omits this alleged advantage to Oaklawn Racetrack and is therefore tainted with partisan coloring.

The ballot title does not mention any date upon which casino gambling may begin in Hot Springs, whether it be at Oaklawn or the other two sites. However, neither does the proposed amendment. Intervenor Crochet's argument is therefore based upon a false premise.

As Respondent points out, the ballot title accurately

describes a two-step process that would determine when gambling at casinos could begin in Hot Springs. First, the voters of Hot Springs must vote to approve the basic issue of whether to allow casino gambling in their city. Second, following approval by Hot Springs voters, casino gambling may not begin at any of the three locations until a casino operator's license is obtained from the state. Thus, the commencement dates for any and all casino gambling in Hot Springs are subject to voter approval and state licensing requirements. Quite simply, there is no date certain set for casino gambling at Oaklawn Racetrack.

▉ It is true that, as Intervenor Crochet contends, Oaklawn would immediately be an approved site for a casino while the location of the two other sites would be subject to local approval in Hot Springs. However, that difference is clearly disclosed in the ballot title as follows:

> IF AUTHORIZED BY VOTERS IN THE CITY OF HOT SPRINGS, CASINO GAMBLING SHALL BE LAWFUL AT OR ADJACENT TO THE OAKLAWN RACETRACK, WHEN CONDUCTED BY A PARI-MUTUEL FRANCHISEE, AND AT TWO OTHER CASINO ESTABLISHMENTS IN HOT SPRINGS LOCATED AT SITES TO BE APPROVED BY THE GOVERNING BODY OF HOT SPRINGS . . . PROVIDING THE GENERAL ASSEMBLY SHALL REGULATE SUCH CASINO GAMBLING AND PRESCRIBE PROCEDURES FOR ISSUING CASINO OPERATOR LICENSES TO A PARI-MUTUEL FRANCHISEE AND TWO OTHER PERSONS OR ENTITIES[.]

We do not perceive the difference as being advantageous to Oaklawn Racetrack because the ultimate authority to determine when casino gambling will begin at all three locations rests with the state's licensing agency. That fact, too, is disclosed in the ballot title. Although a ballot title need not disclose every detail of the proposed law, it is sufficient if it conveys the scope and import of the proposed law. *Bradley*, 220 Ark. 925, 251 S.W.2d 470. The ballot title, as quoted in part above, adequately summarizes the proposed law.

## II. PARI-MUTUEL FRANCHISEE IS OAKLAWN

Intervenor Crochet contends that the ballot title is misleading because it states that casino gambling at Oaklawn Racetrack will be

conducted by a pari-mutuel franchisee but does not inform the voters that there is only one pari-mutuel franchisee in Hot Springs, namely the entity that operates Oaklawn Racetrack. Conversely, Respondent contends that the ballot title contains all the information necessary for voters to identify the pari-mutuel franchisee. We agree with Respondent.

The current ballot title defines "pari-mutuel franchisee" as "a person or entity that holds a pari-mutuel franchise and conducts pari-mutuel wagering on horse racing at Oaklawn Racetrack[.]" The current ballot title also defines "Oaklawn Racetrack" as "the Oaklawn Racetrack site in Hot Springs where pari-mutuel wagering on horse racing was conducted in 1995[.]" Thus, when the ballot title states that "casino gambling shall be lawful at or adjacent to Oaklawn Racetrack, when conducted by a pari-mutuel franchisee," there can be no doubt that the pari-mutuel franchisee is indeed Oaklawn Racetrack and no other entity. We find nothing misleading about this language. Intervenor Crochet argues that this language is misleading because it refers to Oaklawn as "a" pari-mutuel franchisee instead of "the" pari-mutuel franchise. We are convinced that voters will understand that "a" pari-mutuel franchisee refers to Oaklawn Racetrack. Moreover, Intervenor Crochet is not entitled to a ballot title that pleases him personally, as this court has previously recognized the impossibility of drafting a ballot title that would suit everyone. *Hogan* v. *Hall*, 198 Ark. 681, 130 S.W.2d 716 (1939), *cited with approval in Bradley*, 220 Ark. 925, 251 S.W.2d 470.

### III. MORE THAN THREE CASINOS

Intervenor Crochet contends that, while the proposed amendment limits the number of locations where casino gambling is authorized to three, the language of the ballot title will mislead voters into thinking that more than three casino locations are authorized — two at sites other than Oaklawn Racetrack and an unlimited number at or adjacent to Oaklawn Racetrack. Intervenor Crochet contends that the proposal will authorize as many casinos as there are tracts of land adjacent to Oaklawn Racetrack.

We find nothing misleading about the following language of the ballot title: "If authorized by voters . . . casino gambling shall be lawful at or adjacent to the Oaklawn Racetrack . . . and at two other casino establishments in Hot Springs located at

sites to be approved by the governing body of Hot Springs[.]" We have no hesitancy in concluding that the voter will be able to understand that the words "two other casino establishments" mean that a total of only three casino locations will be authorized. We are confident that any potential abuse resulting from the use of the term "casino establishments" would be remedied through regulation by the state as provided in the proposed amendment.

## IV. PARI-MUTUEL WAGERING ON DOG RACING

Intervenor Crochet contends that the ballot title is misleading because it does not inform voters of a substantial change in the law, namely that the proposed amendment will now constitutionally authorize pari-mutuel wagering on dog races. This argument is based upon an entirely false premise and is therefore wholly without merit.

■ It is true that pari-mutuel wagering on dog racing is currently allowed in this state not by way of constitutional law but by way of statutory law. Ark. Code Ann. §§ 23-111-101 to -515 (Repl. 1992 & Supp. 1995); *Scott* v. *Dunaway*, 228 Ark. 943, 311 S.W.2d 305 (1958). However, it is not true that the proposed amendment would change the law so that pari-mutuel wagering on dog races would be constitutionally authorized.

■ The ballot title and proposed amendment prohibit wagering activities, including lotteries, casinos, and gambling activities other than pari-mutuel wagering on horses and dogs, that are not authorized in this proposal or other proposals passed in the November 5, 1996, election. While this language does not prohibit pari-mutuel wagering on dog racing, it does not expressly authorize it via the proposed constitutional amendment either. Moreover, this language does not change Arkansas law; it simply preserves the status quo. The fact that pari-mutuel wagering on dog racing is not prohibited by our current constitution or the proposed amendment simply does not mean that such wagering would be constitutionally authorized if the proposed amendment passes.

All arguments presented are without merit. Accordingly, we deny the petition for injunction.

## ADDENDUM

The following is the complete text of the ballot title of proposed Amendment 4:

A PROPOSED AMENDMENT TO THE ARKANSAS CONSTITUTION TO ESTABLISH A STATE-OWNED LOTTERY, TO BE REGULATED BY THE GENERAL ASSEMBLY; REQUIRING ALL STATE LOTTERY PROCEEDS, LESS EXPENSES AND PRIZES, TO BE APPROPRIATED AS FOLLOWS: 50% FOR LAW ENFORCEMENT, AND 50% TO LOCAL PUBLIC SCHOOL DISTRICTS (ALLOCATED BY AVERAGE DAILY ATTENDANCE); EXPRESSING INTENT THAT SUCH APPROPRIATIONS BE IN ADDITION TO AND NOT A SUBSTITUTE FOR FUNDS OTHERWISE APPROPRIATED FOR SUCH PURPOSES; PROHIBITING SALE OF LOTTERY TICKETS TO MINORS OR THROUGH PURCHASER-OPERATED DEVICES; PROVIDING BINGO GAMES AND RAFFLES MAY BE CONDUCTED FOR CHARITABLE PURPOSES BY NONPROFIT ORGANIZATIONS, AND SHALL BE REGULATED BY THE GENERAL ASSEMBLY; PROVIDING IF AUTHORIZED BY VOTERS IN THE CITY OF HOT SPRINGS, CASINO GAMBLING SHALL BE LAWFUL AT OR ADJACENT TO THE OAKLAWN RACETRACK, WHEN CONDUCTED BY A PARI-MUTUEL FRANCHISEE, AND AT TWO OTHER CASINO ESTABLISHMENTS IN HOT SPRINGS LOCATED AT SITES TO BE APPROVED BY THE GOVERNING BODY OF HOT SPRINGS; DEFINING CASINO GAMBLING AS WAGERING ON GAMES PLAYED WITH CARDS, DICE, OR ANY MECHANICAL, ELECTRICAL, ELECTRONIC, ELECTROMECHANICAL OR COMPUTER DEVICE; DEFINING OAKLAWN RACETRACK AS THE OAKLAWN RACETRACK SITE IN HOT SPRINGS WHERE PARI-MUTUEL WAGERING ON HORSE RACING WAS CONDUCTED IN 1995; DEFINING PARI-MUTUEL FRANCHISEE AS A PERSON OR ENTITY THAT HOLDS A PARI-MUTUEL FRANCHISE AND CONDUCTS PARI-MUTUEL WAGERING ON HORSE RACING AT OAKLAWN RACETRACK; PROVIDING FOR A LOCAL ELECTION IN HOT SPRINGS 90 TO 150 DAYS AFTER PASSAGE OF THE AMENDMENT AND FOR FU-

TURE ELECTIONS IN HOT SPRINGS REGARDING AUTHORIZATION OF CASINO GAMBLING AT THE LOCATIONS SET FORTH ABOVE; PROVIDING THE FORM OF BALLOT QUESTION FOR ANY SUCH LOCAL ELECTION; PROVIDING IF CASINO GAMBLING IS AUTHORIZED BY HOT SPRINGS VOTERS, SUCH AUTHORIZATION MAY NOT BE AMENDED OR REPEALED EXCEPT AT A SUBSEQUENT LOCAL ELECTION HELD NO EARLIER THAN FIVE YEARS THEREAFTER; PROVIDING THE GENERAL ASSEMBLY SHALL REGULATE SUCH CASINO GAMBLING AND PRESCRIBE PROCEDURES FOR ISSUING CASINO OPERATOR LICENSES TO A PARI-MUTUEL FRANCHISEE AND TWO OTHER PERSONS OR ENTITIES; PROVIDING CASINO GAMBLING AT OR ADJACENT TO OAKLAWN RACETRACK SHALL NOT BE LIMITED TO TIMES WHEN PARI-MUTUEL WAGERING IS CONDUCTED; REQUIRING THE GENERAL ASSEMBLY TO LEVY A PRIVILEGE TAX ON CASINO OPERATORS OF 14% TO 18% OF NET CASINO GAMBLING REVENUES; PROHIBITING OTHER SPECIAL TAXES OR FEES WITH RESPECT TO CASINO GAMBLING OR RELATED ACTIVITIES; ALLOCATING SUCH PRIVILEGE TAX 85% TO THE STATE, 10% TO HOT SPRINGS, AND 5% TO GARLAND COUNTY; PROHIBITING PERSONS UNDER AGE 21 FROM PARTICIPATING IN CASINO GAMBLING; PROHIBITING WAGERING ACTIVITIES OTHER THAN PARI-MUTUEL WAGERING ON HORSES AND GREYHOUNDS AND THOSE ACTIVITIES AUTHORIZED BY THE AMENDMENT OR ANY OTHER AMENDMENT(S) TO THE ARKANSAS CONSTITUTION APPROVED BY VOTERS AT THE NOVEMBER 5, 1996 GENERAL ELECTION; REPEALING ALL CONSTITUTIONAL PROVISIONS AND LAWS TO THE EXTENT THEY CONFLICT WITH THE AMENDMENT; RETAINING THE EXISTING CONSTITUTIONAL PROVISION MAKING HORSE RACING AND PARI-MUTUEL WAGERING THEREON LAWFUL IN HOT SPRINGS; RENDER-

ING THE PROVISIONS OF THE AMENDMENT SEV-
ERABLE; AND DECLARING THE AMENDMENT
OPERATIVE UPON PASSAGE.