Gerald J. CROCHET, Jr., Petitioner *v.* Sharon PRIEST, In Her Official Capacity as Secretary of State of the State of Arkansas, Respondent;

Bill Walmsley, Individually and as President and on Behalf of the Arkansas Horsemen's Benevolent and Protective Association, Inc., an Arkansas Corporation, Petitioners *v.* Sharon Priest, In Her Official Capacity as Secretary of State of the State of Arkansas, Respondent;

The Committee for Lottery, Charitable Bingo and Raffles, and Video Games, Intervenor

96-1013, 96-1021                                           931 S.W.2d 128

Supreme Court of Arkansas
Opinion delivered October 21, 1996

Petitioner Gerald J. Crochet, Jr., *pro se.*

*Winston Bryant,* Att'y Gen., by: *Melissa K. Rust,* Asst. Att'y Gen., for respondent.

*Tom Thompson*, for petitioner Bill Walmsley.

*Arnold, Grobmyer & Haley*, by: *Robert R. Ross*, for intervenor.

DONALD L. CORBIN, Justice. Two original action petitions filed pursuant to Amendment 7 to the Arkansas Constitution of 1874 were consolidated in this case. Both petitions seek injunctions restraining Respondent, Secretary of State Sharon Priest, from placing proposed Amendment 5 to the Arkansas Constitution, which bears the popular name "AN AMENDMENT TO AUTHORIZE LOTTERY TICKET GAMES, CHARITABLE BINGO, RAFFLES, AND VIDEO TERMINAL GAMES" on the ballot for the general election to be held November 5, 1996. Alternatively, they request Respondent be enjoined from canvassing and declaring the results of proposed Amendment 5.

Petitioners are Bill Walmsley, individually and on behalf of the Arkansas Horsemen's Benevolent and Protective Association, Incorporated, and Gerald J. Crochet, Jr., a citizen, resident, taxpayer, and registered voter of this state. We allowed the intervention of The Committee For Lottery, Charitable Bingo and Raffles, and Video Terminal Games, a ballot question committee as defined in Ark. Code Ann. § 7-9-402(2) (Repl. 1993). Petitioners challenge both the popular name and ballot title of the proposed amendment. The text of the ballot title is appended to this opinion. We find merit to their claim that the popular name and ballot title are insufficient and therefore grant the petition requesting injunctive relief.

## Procedural History

The following facts are taken from the petitions and responses filed in this case. The sponsors of the proposed amendment submitted a proposed popular name and ballot title to the Attorney General of this state on February 9, 1996. Approximately six to ten days later, the Attorney General expressed concern over the length of the proposed ballot title and its susceptibility to challenge, but nevertheless certified the popular name as submitted and a substituted ballot title. On August 9, 1996, Respondent certified the proposed amendment to be placed on the ballot for the November 5, 1996, general election.

Petitioners Crochet and Walmsley filed separate original-action petitions on August 29 and 30, 1996, respectively. On September 23, 1996, we granted three motions concerning these petitions: Intervenor's motion to intervene in Petitioner Walmsley's case, Petitioner Crochet's motion to consolidate the two cases, and Petitioner Crochet's motion to expedite the cases for our consideration.

*Standard of Review*
*Sufficiency of Popular Name and Ballot Title*

We recently summarized the applicable standard for our review of ballot-title cases:

> The popular name is primarily a useful legislative device that need not contain the same detailed information or include exceptions that might be required of a ballot title. *Chaney* v. *Bryant*, 259 Ark. 294, 532 S.W.2d 741 (1976) (citing *Pafford* v. *Hall*, 217 Ark. 734, 233 S.W.2d 72 (1950)). Ballot titles must include an impartial summary of the proposed amendment that will give voters a fair understanding of the issues presented and of the scope and significance of the proposed changes in the law; they cannot omit material information that would give the voter serious ground for reflection; they must be free from misleading tendencies that, whether by amplification, omission, or fallacy thwart a fair understanding of the issues presented. *Bailey* v. *McCuen*, 318 Ark. 277, 884 S.W.2d 938 (1994); *Christian Civic Action Comm.* v. *McCuen*, 318 Ark. 241, 884 S.W.2d 605 (1994).

*Parker* v. *Priest*, 326 Ark. 123, 129, 930 S.W.2d 322, 325.

Amendment 7 places the burden of proof in legal challenges to initiative matters upon those who challenge the proposed measure. *Christian Civic Action Comm.* v. *McCuen*, 318 Ark. 241, 884 S.W.2d 605 (1994). When determining the sufficiency of ballot titles, we construe the requirements of Amendment 7 liberally in order to secure its purposes to reserve to the people the right to adopt or reject legislation; however, that liberality is not without limits or common sense. *Id.*; *Gaines v. McCuen*, 296 Ark. 513, 758 S.W.2d 403 (1988). The question is not how the members of this court feel concerning the wisdom of the proposed amendment, but rather whether Amendment 7's requirements for submission of the proposal to the voters have been satisfied. *Ferstl* v. *McCuen*, 296 Ark. 504, 758 S.W.2d 398 (1988). Amendment 7 vests original and exclusive jurisdiction over the sufficiency of statewide petitions to this court. Thus, while we consider the fact that the Attorney General certified this ballot title, we do not defer to the Attorney General's opinion or give it presumptive effect. *Bailey* v. *McCuen*, 318 Ark. 277, 884 S.W.2d 938 (1994).

### Length and Complexity of Ballot Title

Petitioners contend that the proposed amendment, with its 11 definitions, 17 sections, and 127 subsections, is so all-encompassing and expansive that it precludes an acceptable ballot title. As a result, argue Petitioners, the approximate 1,000 words in the ballot title do not adequately inform the voter in sufficient detail of the content of the proposed amendment. Both Respondent and Intervenor view this argument as one coming out of both sides of Petitioners' mouths, i.e., the ballot title is too long but also omits material information.

To the contrary, we view this argument as an attempt to align the present case with this court's statements in *Page v. McCuen*, 318 Ark. 342, 347, 884 S.W.2d 951, 954 (1994):

> The Amendment 5 sponsors' choice or insistence in covering the establishment and operation of casino gaming in so much detail can be said to have sounded the proposal's own death knell. Here, proposed Amendment 5 is so all-encompassing that to include every important factor of the proposal in the ballot title would cause the ballot title to be so complex, detailed and lengthy that the Arkansas voter could not intelligently make a choice on the title within the five minutes allowed in the voting booth. *Cf. Dust v. Riviere, Secretary of State*, 277 Ark. 1, 638 S.W.2d 663 (1977); *see also Gaines v. McCuen*, 296 Ark. 513, 758 S.W.2d 403 (1988); Ark. Code Ann. § 7-5-522(d) (Repl. 1993). Although Amendment 7 to the Arkansas Constitution does not specify a limit on the length of a proposal, the proposed measure must be of a size capable of having a ballot title which will not only convey the scope and import of the measure, but also impart a description of the proposal so voters can cast their votes intelligently and with a fair understanding on the issue. In sum, proposed Amendment 5 is so expansive that it precludes the writing of an acceptable ballot title.

Indeed, Petitioners cite *Page* in support of this argument. However, they also acknowledge that length alone does not render a ballot title insufficient and argue that when the length is combined with the omissions and misleading language, this ballot title is insufficient.

■ Petitioners are correct that while length is a consideration, it is by no means the determining factor on the question of the sufficiency of a ballot title. *Parker*, 326 Ark. 123, 930 S.W.2d 322. Likewise, there is no restriction on the length of a proposed amendment. *Page*, 318 Ark. 342, 884 S.W.2d 951 (citing Amendment 7). As this court intimated in the foregoing quotation from *Page*, however, there is in effect a practical constraint on the length of both a proposed amendment and its ballot title that stems from the requirements that a ballot title convey the scope and import of the proposal while also imparting a fair description of the proposal to allow voters to vote intelligently in the limited time allotted them in a voting booth. In the words of the Attorney General's opinion certifying the ballot title at issue here, "with any proposed initiative similar in length to the one submitted in this instance, the sponsor runs the risk of an unacceptable ballot title."

■ The present proposed amendment and ballot title are, in relative terms, at least as long and detailed as most that have been considered by this court. *See, e.g., Page*, 318 Ark. 342, 884 S.W.2d 951. Nevertheless, we decline to hold the ballot title insufficient because of its length alone. Rather, the length is but one consideration for us as we determine the sufficiency of the ballot title.

*Omission of Material Information — Expansive Powers of Commission*

Petitioners contend that the proposed amendment creates an Arkansas Lottery Commission and grants sweeping and comprehensive powers to the Commission that will have enormous consequences without disclosing these powers in the popular name or ballot title. We agree.

We find particularly disturbing the following language from Section 8(d)(6) of the proposed amendment:

> The Arkansas Lottery Commission shall prescribe such other rules and regulations as it deems necessary for the conduct and regulation of Bingo and Raffles and *shall retain full authority to change any and all provisions of this amendment pertaining to charitable bingo and raffle games at its sole discretion as times and conditions may dictate.* [Emphasis added.]

The proposed amendment thus clearly gives the Commission the power to amend the terms of the amendment as it relates to bingo and raffles. This power of the Commission to amend a constitutional amendment is not disclosed in the ballot title. Respondent and Intervenors argue that the ballot title's disclosure of the Com-

mission's authority to adopt rules and regulations includes a disclosure that the Commission has authority to amend the proposed amendment. We disagree.

Under present law, the Arkansas Constitution may only be amended by two methods. The General Assembly may draft amendments and submit them to the voters pursuant to Article 19, Section 22, and the people may propose amendments through the initiative process pursuant to Amendment 7, as was done in this case. The marked departure from existing law created by Section 8(d)(6) of the proposed amendment should have been disclosed in the ballot title. Before casting their votes, citizens no doubt would pause for reflection if they were aware that they might be giving the Commission authority to amend, or even completely rewrite, parts of the very amendment upon which they were voting. Thus, we conclude that the omission in the ballot title of the Commission's power to amend the terms of this amendment is a material omission that renders this ballot title insufficient. We note that this is but one example of material omissions in the ballot title concerning the Commission's powers. The Commission's power to raise the price of wagers is discussed later herein. There are others we could discuss, but find it unnecessary to do so.

### Use of the Term "Video Terminal Game"

According to the text of the proposed amendment, ballot title, and popular name, the proposed amendment authorizes "video terminal games." The popular name does not give a definition for the term "video terminal games." The ballot title, however, defines "video terminal gaming" as follows: "AN ELECTRONIC VIDEO GAME THAT, UPON INSERTION OF TWENTY-FIVE CENT COINS, PROVIDES CREDITS TO PLAY OR SIMULATE THE PLAY OF AUTHORIZED GAMES AND THAT ISSUES A PAY SLIP TO A WINNING PLAYER THAT MAY BE REDEEMED FOR CASH[.]" Prior to this definition, the ballot title states that "THE GAMES OF BINGO, KENO AND POKER ARE INITIALLY AUTHORIZED TO BE PLAYED ON THE VIDEO TERMINALS[.]" Petitioners contend that to the extent the term "video terminal games" refers to what are more commonly known as slot machines, the language of the term is misleading. Petitioners argue that the voters will not realize that "video terminal games" are slot machines.

Respondent and Intervenor neither admit nor deny that the

term "video terminal games" includes slot machines. Rather, they rely on the definition in the ballot title to clear up any misleading tendencies, and Intervenor argues further that Petitioners have not explained how slot machines differ from bingo, keno, and poker. Intervenor thus ignores the problem. We are not concerned with the difference here. Quite to the contrary, we are concerned with the similarity and whether voters will be able to recognize that similarity. Specifically, our concern is whether voters will be able to determine that the term "video terminal games" describes what are more commonly known as slot machines.

Petitioners rely on *Christian Civic Action Comm.* v. *McCuen*, 318 Ark. 241, 884 S.W.2d 605, where this court held that the term "additional racetrack wagering" was a euphemism for "casino-style gambling" that rendered the ballot title misleading and insufficient. Here, Petitioner argues, in essence, that the less offensive term "video terminal games" is a euphemism for the more distasteful term "slot machines."

The term "video terminal games" is misleading and tinged with partisan coloring because it does not evoke images or thoughts of gambling in any respect. Any possible enlightenment from the ballot title's definition is diluted by the strategic placement of the definition midway through the lengthy ballot title. Quite simply, the term "video terminal games" summons absolutely no connotation of currently illegal gambling, while the term "slot machine" does. To include the term "video terminal games" in an amendment that uses words such as "lottery," "bingo," and "raffles," the latter three of which connote games of chance or gambling, while the first does not, is to tinge the term "video terminal games" with partisan coloring.

While voters may be able to discern that the term "video terminal games" means slot machines, they should not be forced to guess the meaning of a proposed amendment to their state's constitution. The very purpose of the ballot title is to convey a fair and impartial understanding of the proposal. To call slot machines "video terminal games," which connotes a present-day video game such as Nintendo or Sega Genesis, is anything but fair and impartial. Consequently, we conclude that the use of the term "video terminal games" creates a fatally misleading tendency in the popular name and ballot title and tinges them with partisan coloring.

### Minimum Wager on "Video Terminal Games"

The very first five lines of the ballot title state: "AN AMEND-MENT TO THE ARKANSAS CONSTITUTION AUTHOR-IZING LOTTERY TICKET GAMES, CHARITABLE BINGO, RAFFLES, AND *TWENTY-FIVE CENT* VIDEO TERMINAL GAMES" (emphasis added). Petitioners contend that this deceptively implies that the "video terminal games" authorized by the proposed amendment will allow only twenty-five-cent wagers.

We agree that the ballot title is misleading on this point because Section 9(c)(3)(B) of the text of the proposed amendment provides that "a Video Terminal Game may be played for a minimum 25 cent coin deposit. The maximum single play that may be placed on a Video Terminal games is [*sic*] $2.00 during the first five (5) years of operation, but thereafter may be increased by the Arkansas Lottery Commission." Thus, it is clear that while the "video terminal games" accept a twenty-five-cent coin, twenty-five cents is not a limitation on the amount of the total wager. Rather, the text of the proposal clearly provides a two-dollar limit on the amount of the total wager for a single play. Moreover, in addition to the authority to raise that initial limit of two dollars on the maximum wager, Section 4(c)(14) gives the Commission additional authority, after the expiration of the approximate five-year start-up period, to "change the amount of money required for a single play on video terminal games from 25¢ to an amount higher or lower, that more accurately reflects the times and conditions at hand."

Respondent and Intervenor rely on the following language, which occurs midway through the ballot title: "VIDEO TERMINAL GAMING MEANS AN ELECTRONIC VIDEO GAME THAT, UPON INSERTION OF TWENTY-FIVE CENT COINS . . . ." Respondent and Intervenor argue that the use of the plural "coins" reveals that twenty-five cents is not the minimum wager. While we have the utmost confidence in the voters' abilities to distinguish the plural from the singular form of a word, we cannot conclude that a single letter "s" cures the misleading tendency created by the use of the term "twenty-five cent video terminal games" in the first five lines of the ballot title, especially when that single letter "s" occurs some seventy lines later. In short, the use of the plural "coins" does not disclose that the proposed amendment actually authorizes a two-dollar wager. Voters would no doubt pause for reflection if they knew that by voting for a ballot

title that authorizes "twenty-five cent video terminal games," they were in fact voting for an amendment that authorizes two-dollar video terminal games. We conclude the appearance of numerous references to the amount of twenty-five cents is misleading, especially when coupled with the omission of the two-dollar maximum wager on a single play.

Other misleading tendencies and omissions could be illustrated, but the aforementioned examples suffice to demonstrate that the popular name and ballot title are insufficient. The length of this ballot title complicates these insufficiencies. Accordingly, we hold the proposed amendment's popular name and ballot title insufficient to satisfy the requirements of Amendment 7. Petitioners' request for injunctive relief is granted. Respondent is enjoined from placing proposed Amendment 5 on the ballot for the November 5, 1996, general election. Alternatively, Respondent is enjoined from canvassing and declaring the results on proposed Amendment 5.

The mandate is ordered issued on Friday, October 25, 1996, unless a petition for rehearing is filed. If a petition for rehearing is filed, briefing will be on an expedited basis to be set by the clerk.

Petition granted.

Special Justice DODDRIDGE M. DAGGETT joins in this opinion.

DUDLEY, J., not participating.

### ADDENDUM

#### (Ballot Title)

AN AMENDMENT TO THE ARKANSAS CONSTI-TUTION AUTHORIZING LOTTERY TICKET GAMES, CHARITABLE BINGO, RAFFLES, AND TWENTY-FIVE CENT VIDEO TERMINAL GAMES; CREATING A SEVEN-MEMBER ARKANSAS LOT-TERY COMMISSION TO BE APPOINTED BY THE GOVERNOR, SUBJECT TO CONFIRMATION BY THE SENATE, TO ESTABLISH AND CONDUCT THE LOTTERY TICKET GAMES AND TO REGULATE CHARITABLE BINGO, RAFFLES AND VIDEO TER-MINAL GAMES AUTHORIZED BY THE AMEND-MENT; PROVIDING THAT THE COMMISSION SHALL APPOINT A DIRECTOR TO DIRECT THE

OPERATIONS OF THE LOTTERY TICKET GAMES; AUTHORIZING THE COMMISSION TO SPECIFY WHAT LOTTERY TICKET GAMES MAY BE CONDUCTED AND TO REGULATE THE SELECTION OF RETAIL ORGANIZATIONS AUTHORIZED TO SELL LOTTERY TICKETS; PROHIBITING LOTTERY TICKET SALES TO ANYONE UNDER 21 YEARS OF AGE OR THROUGH ANY PURCHASER OPERATED SYSTEM; PROVIDED THAT THE REVENUES FROM THE STATE LOTTERY WILL BE ALLOCATED AS FOLLOWS: AN AVERAGE OF 50 PERCENT IN PRIZES TO PLAYERS; 32 PERCENT TO FUND THE ARKANSAS LOTTERY PHARMACEUTICAL ASSISTANCE PROGRAM FOR MATURE ARKANSANS TO ASSIST WITH THE COST OF PRESCRIPTION MEDICINES FOR THOSE WHO MEET THE AGE, INCOME AND HARDSHIP QUALIFICATION; 10 PERCENT TO THE ARKANSAS LOTTERY COMMISSION TO COVER COSTS OF ADMINISTERING THE ARKANSAS LOTTERY AND REPAYMENT OF START-UP FINANCING WITH ANY REMAINING BALANCE TO BE APPLIED TO THE ARKANSAS LOTTERY PHARMACEUTICAL ASSISTANCE PROGRAM FOR MATURE ARKANSANS; AND 8 PERCENT TO ARKANSAS LOTTERY RETAILERS IN PROPORTION TO THE RETAILER'S SALE OF LOTTERY TICKETS; PROVIDING THAT CHARITABLE BINGO GAMES AND RAFFLES MAY BE CONDUCTED BY ANY NON-PROFIT, TAX-EXEMPT RELIGIOUS, EDUCATION, VETERANS', FRATERNAL, SERVICE, CIVIC, MEDICAL, VOLUNTEER RESCUE SERVICE, FIREFIGHTERS', VOLUNTEER POLICE ORGANIZATION OR OTHER ORGANIZATION WHICH HAS BEEN IN EXISTENCE IN THIS STATE FOR NOT LESS THAN THREE (3) YEARS AND WHICH HAS BEEN ISSUED A CURRENT LICENSE TO CONDUCT THE GAMES; RESTRICTING THE HOURS THAT BINGO GAMES AUTHORIZED BY THIS AMENDMENT MAY BE CONDUCTED; REQUIRING ALL NET RECEIPTS EXCEEDING THE ACTUAL COST OF CONDUCTING A BINGO GAME

OR RAFFLES TO BE USED ONLY FOR CHARITA-
BLE, RELIGIOUS OR PHILANTHROPIC PURPOSES;
PROVIDING THAT THE ARKANSAS LOTTERY
COMMISSION SHALL PROMULGATE RULES AND
REGULATIONS FOR LICENSING, MONITORING
AND ENFORCEMENT FOR THE PLACEMENT AND
OPERATION OF VIDEO TERMINALS IN ARKAN-
SAS; PROVIDING THAT THE GAMES OF BINGO,
KENO AND POKER ARE INITIALLY AUTHORIZED
TO BE PLAYED ON THE VIDEO TERMINALS AU-
THORIZED BY THE AMENDMENT; PROHIBITING
PLAY OF VIDEO TERMINAL GAMES BY ANYONE
UNDER 21 YEARS OF AGE; PROVIDING THAT
VIDEO TERMINAL GAMING MEANS AN ELEC-
TRONIC VIDEO GAME THAT, UPON INSERTION
OF TWENTY-FIVE CENT COINS, PROVIDES
CREDITS TO PLAY OR SIMULATE THE PLAY OF
AUTHORIZED GAMES AND THAT ISSUES A PAY
SLIP TO A WINNING PLAYER THAT MAY BE RE-
DEEMED FOR CASH; RESTRICTING THE PLACE-
MENT OF SUCH VIDEO TERMINALS TO PARI-
MUTUEL FRANCHISEES AUTHORIZED TO CON-
DUCT HORSE RACING OR GREYHOUND RAC-
ING AND TO CERTAIN PREMISES WHICH MEET
PERMIT REQUIREMENTS OF THE ARKANSAS AL-
COHOLIC BEVERAGE CONTROL BOARD'S RULES
AND REGULATIONS; LIMITING THE NUMBER OF
VIDEO TERMINALS THAT MAY BE LOCATED AT
THE AUTHORIZED LOCATIONS; PROVIDING
THAT THE ARKANSAS LOTTERY COMMISSION
AND THE ARKANSAS STATE POLICE LOTTERY DI-
VISION TO BE CREATED WILL ADMINISTER THE
LICENSING PROGRAM CONNECTED WITH
VIDEO TERMINAL GAMES; PROVIDING THAT THE
ARKANSAS STATE POLICE LOTTERY DIVISION
WILL MONITOR VIDEO TERMINAL GAMES AC-
CORDING TO GUIDELINES ESTABLISHED BY THE
ARKANSAS LOTTERY COMMISSION; PROVIDING
THAT LOTTERY SYSTEMS, INC., A PRIVATE AR-
KANSAS CORPORATION, SHALL SERVE AS THE
SOLE AND EXCLUSIVE OPERATOR FOR ALL

VIDEO TERMINAL GAMES IN THE STATE AND AS SUCH SHALL OWN, PLACE, INSTALL, SERVICE AND MAINTAIN THE VIDEO TERMINALS; PROVIDING THAT LOTTERY SYSTEMS, INC., WILL SUPPLY THE START-UP FINANCING FOR THE ARKANSAS LOTTERY COMMISSION, THE ARKANSAS LOTTERY TICKET GAMES, THE ARKANSAS STATE POLICE DIVISION, AND THE VIDEO TERMINAL GAMES, SUBJECT TO LOTTERY SYSTEMS, INC. BEING REPAID, EXCEPT FOR COST OF VIDEO TERMINAL GAMES, WITH INTEREST BY THE ARKANSAS LOTTERY COMMISSION WITHIN FIVE (5) YEARS FROM THE DATE OF INITIAL FINANCING FROM LOTTERY GROSS REVENUES AND LICENSING FEES; REQUIRING THAT LOTTERY SYSTEMS, INC. NOT BE REQUIRED TO PROVIDE MORE THAN $65,000,000 FOR THE COMBINED COSTS OF START-UP FINANCING; AND FOR PROCUREMENT, LICENSING AND INSTALLATION OF VIDEO TERMINAL MACHINES; REQUIRING LOTTERY SYSTEMS, INC., BETWEEN START-UP AND SIX MONTHS AFTER THE CONCLUSION OF THE FIVE-YEAR START-UP PERIOD TO CAUSE ALL OF ITS STOCKHOLDERS TO MAKE A PUBLIC OFFERING OF ALL OF THEIR OWNERSHIP TO THE PUBLIC THROUGH LICENSED ARKANSAS SECURITY DEALERS; PROVIDING THAT IF LOTTERY SYSTEMS, INC. FAILS TO PROVIDE THE START-UP FINANCING, THE ARKANSAS LOTTERY COMMISSION SHALL DETERMINE A SUBSTITUTE METHOD FOR IMPLEMENTING THE PROVISIONS OF THIS AMENDMENT; PROVIDING THAT THE VIDEO TERMINAL LICENSING FEES BE FIRST ALLOCATED TO FUND 100 PERCENT (100%) OF THE BUDGET OF THE ARKANSAS STATE POLICE LOTTERY DIVISION WITH THE BALANCE NEXT APPLIED TO FUNDING ONE-HALF OF THE ARKANSAS LOTTERY COMMISSION BUDGET; PROVIDING THAT THE VIDEO TERMINAL GROSS REVENUES SHALL BE ALLOCATED AS FOLLOWS: AN AVERAGE OF 88 PERCENT TO PLAYERS; 3

PERCENT THE FIRST YEAR, 3.6 PERCENT THE SECOND YEAR, AND 4.2 PERCENT THE THIRD YEAR AND 4.8 PERCENT THE FOURTH AND SUBSEQUENT YEARS TO LOCAL POLICE AND SHERIFFS' DEPARTMENTS, STATE GENERAL EDUCATION FUND AND HIGHER EDUCATION FUND AND TO NON-GOVERNMENTAL DIRECT SERVICE SHELTER ORGANIZATIONS TO COMBAT DOMESTIC VIOLENCE; 4.2 PERCENT THE FIRST YEAR, 3.72 PERCENT THE SECOND YEAR, 3.84 PERCENT THE THIRD YEAR AND 3.6 PERCENT THE FOURTH AND SUBSEQUENT YEARS TO THOSE ESTABLISHMENTS LICENSED AND AUTHORIZED TO PLACE VIDEO TERMINAL GAMES ON THEIR PREMISES; AND 4.8 PERCENT THE FIRST YEAR, 4.68 PERCENT THE SECOND YEAR AND 3.96 PERCENT THE THIRD YEAR AND 3.6 PERCENT THE FOURTH AND SUBSEQUENT YEARS TO LOTTERY SYSTEMS, INC.; PROHIBITING THE IMPOSITION OF ANY STATE OR LOCAL INCOME AND SALES TAX UPON ANY PRIZE WINNINGS FROM GAMES AUTHORIZED BY THE AMENDMENT; PROHIBITING ANY STATE OR LOCAL TAX OF ANY KIND UPON THE FEES OR REVENUES GENERATED PURSUANT TO THIS AMENDMENT OR UPON ANY ASPECT OF THE LOTTERY GAMES AUTHORIZED BY THE AMENDMENT; MAKING THE AMENDMENT EFFECTIVE UPON PASSAGE, RENDERING ITS PROVISIONS SEVERABLE, AND REPEALING ALL EXISTING LAWS AND CONSTITUTIONAL PROVISIONS TO THE EXTENT THEY CONFLICT WITH THIS AMENDMENT; PROVIDING THAT THIS AMENDMENT IS SELF-EXECUTING; AND FOR OTHER PURPOSES.