William L. "Bill" WALKER, R.C. "Bill"
Lewellen, Jean Edwards, John Lewellen, Tracy
Steele, John Eason, Robert White, Lindergh
Thomas, Michael Booker, Wilma Walker, Henry
Wilkins IV, Joe Harris, Steve Jones, Arnell
Willis, Calvin Johnson, Individually and as
Members of the Arkansas Legislative Black
Caucus, *Petitioners*, and James Lane, *Intervenor*
*v.* Sharon PRIEST, In Her Official Capacity as
Secretary of State of the State of Arkansas,
and Arkansas Children's Hospital, Arkansas
Hospital Association, Governor Mike Huckabee,
University of Arkansas, Arkansas State
University, American Cancer Society, American
Heart Association, American Lung Association,
Arkansans for Drug Free Youth, Hispanic
Health Program, Campaign for Tobacco Free
Kids, and National Black Leadership
Initiative on Cancer, Individually, and as
Members of Coalition for a Healthy Arkansas
Today ("CHART"), *Intervenors.*

00-1037 29 S.W.3d 657

Supreme Court of Arkansas
Opinion delivered October 20, 2000

*Rickey Hicks*; *R. C. "Bill" Lewellen*; *Herschel W. Cleveland*; and *Michael D. Booker*, for petitioners.

*Rieves, Rubens & Mayton*, by: *Kent J. Rubens*, for intervenor James Lane.

*Tim Humphries*, General Counsel, Arkansas Secretary of State; and *Mark Pryor*, Att'y Gen., by: *Dennis R. Hansen*, Ass't Att'y Gen., for respondent.

*Williams & Anderson LLP*, by: *W. Jackson Williams*, *Peter G. Kumpe*, and *Jess Askew III*, for intervenors Arkansas Children's Hospital *et al.*

TOM GLAZE, Justice. Representative Bill Walker and other members of the Arkansas Legislative Black Caucus filed this original action petition, under Ark. Const. amend. 7, seeking to enjoin the Secretary of State from placing Proposed Initiated Act No. 1 ("The Tobacco Settlement Proceeds Act") on the November 7, 2000, General Election ballot. The petitioners generally allege that the ballot title of the act "fails to convey an intelligible idea of the scope and import of the Proposed [Act], and is insufficient to enable a voter . . . to make an intelligent choice, fully aware of the consequences of his or her vote." James Lane subsequently intervened in this action, and joined in the petitioners' challenge of the Act's ballot title. The petitioners and Lane allege two primary defects in the ballot title: (1) it is so complex, lengthy, and detailed that a voter cannot intelligently make a choice in the time allotted him or her to vote, and (2) despite the title's length, the title is misleading, incomplete, deceptive, and has serious omissions.[1]

Respondent Sharon Priest, Secretary of State, through her counsel, Attorney General Mark Pryor, answered the petitioners' and Lane's allegations, denying that the Act's ballot title is defective. The Act's sponsors, known as the Coalition for a Healthy Arkansas Today (CHART), intervened in this proceeding and joined the State's argument that the Act's ballot title is complete, fair, and

---

[1] The petitioners and Lane initially questioned the validity and constitutionality of the Act, but they now concede these issues are not subject to attack until or unless the Act is approved by the electorate.

intelligible and should remain on the general election ballot and be counted.

As background information, the initiated Act's ballot title was certified by the Attorney General and submitted to the Secretary of State on May 3, 2000; the Secretary of State approved and certified the sufficiency of the ballot title on May 5, 2000, and certified that the petition met the signature requirements and the requirements of Amendment 7 for placement on the November 7 ballot.

In his opinion accompanying the ballot title's certification, the Attorney General commented on "the particular hazards attendant to the preparation of a ballot title for a lengthy and complex proposal such as this one." Op. Att'y Gen. # 2000-137, at 7. This opinion also noted that the ballot title in this case measured 994 words long, and the longest title ever approved contained 900 words. *Bailey v. Hall*, 198 Ark. 815, 131 S.W.2d 635 (1939). The Attorney General pointed out "that with any proposed act of considerable length and complexity, the sponsor runs the risk of a challenge and of a finding by the court that a ballot title prepared for the measure would be unacceptable, either because it is too 'complex, detailed, and lengthy,' or because it has 'serious omissions.' " Op. Att'y Gen. # 2000-137, at 8 (citing *Crochet v. Priest*, 326 Ark. 338, 931 S.W.2d 128 (1996)). Finally, the Attorney General noted that this court has held in some instances that "the text of some measures 'precludes the writing of an acceptable ballot title.' " However, he would not determine "whether this is such a measure," stating he would be "loath . . . to follow the only option other than certification . . . of rejecting your submission based upon the *substance* of the proposed act."

The questions now before us are whether the ballot title to the proposed initiated act is too complex, detailed, and lengthy for a voter to make an intelligent choice, and whether it is misleading, incomplete, deceptive, and suffering from serious omissions.

We turn first to petitioners' contention that the Act's ballot title is so lengthy and complex that the voter cannot reasonably understand the title when reading it in the time allotted the voter to cast his or her ballot. Petitioners complain that the title contains 994 words and "is riddled with clause upon clause and modifier upon modifier." They claim a voter reading the title would be

unable to ascertain how the tobacco settlement proceeds and its percentages will be allocated, how the trust fund with the proceeds will be impacted, what option the legislature will have over the proceeds in the future, and what role the various state agencies will have. They further assert that the title is as complex and lengthy a title as this court has ever considered, and for these reasons, the Act should be stricken from the November 7 ballot. Taking this same general ground of attack, Intervenor Lane complains that the title's words include "legalese" and terms that are not defined or explained, and that the average voter will not be able to read and comprehend this act and the other proposed constitutional amendments on the ballot, when making choices between them and the various federal, state, and local candidates. Lane claims that, under these circumstances, length alone should be a sufficient ground to determine the Act's ballot deficient.[2]

■ ■ The standards of review of a ballot-title case under Amendment 7 are well settled. In the more recent case of *Crochet v. Priest*, 326 Ark. 338, 931 S.W.2d 128 (1996), we repeated many of these controlling principles beginning with the established rules that Amendment 7 places the burden of proof in legal challenges to initiative matters upon those who challenge the proposed measure, and that this court will construe the requirements of Amendment 7 liberally in order to secure its purposes to reserve to the people the right to adopt or reject legislation. However, the court has also stated that liberality is not without limits or common sense. *Id.* at 342.

■ When we are confronted with a challenge to a ballot title based on the length of that title, as we are in this case, language found in *Page v. McCuen*, 318 Ark. 342, 884 S.W.2d 951 (1994), is instructive. In *Page*, certain petitioners challenged a 587-word ballot title which attempted to cover a forty-page long proposal, comprised of twenty-three sections and more than 150 subsections. The court first noted that in drafting the ballot title for the proposed amendment there, the sponsors could not possibly cover the entire proposal because, if they had, the voter would have found it impossible to read, understand and cast his or her vote on the issue while at the polling precinct. *See Page*, 318 Ark. at 344. After

---

[2] In making this argument, Lane also recognized that he is aware that no case has held that length alone precludes submission of a ballot title to the electorate.

discussing a number of omissions and misleading statements that amounted to fatal defects, the *Page* court held as follows:

> Here, proposed Amendment 5 is so all-encompassing that to include every important factor of the proposal in the ballot title would cause the ballot title to be so complex, detailed and lengthy that the Arkansas voter could not intelligently make a choice on the title within the five minutes allowed in the voting booth. *Cf. Dust v. Riviere, Secretary of State,* 277 Ark. 1, 638 S.W.2d 663 (1982); *see also Gaines v. McCuen,* 296 Ark. 513, 758 S.W.2d 403 (1988); Ark. Code Ann. 7-5-522(c) (Repl. 1993). Although Amendment 7 to the Arkansas Constitution does not specify a limit on the length of a proposal, the proposed measure must be of a size capable of having a ballot title which will not only convey the scope and import of the measure, but also impart a description of the proposal so voters can cast their votes intelligently and with a fair understanding on the issue. In sum, proposed Amendment 5 is so expansive that it precludes the writing of an acceptable ballot title.

■ Our court in *Crochet* was presented with a similar situation to the one in *Page.* In *Crochet,* the ballot title contained approximately 1,000 words, covering eleven definitions, seventeen sections, and 127 subsections. The court noted that length is indeed a consideration, but it is by no means the determining factor on the question of the sufficiency of the ballot title. *See also Scott v. Priest,* 326 Ark. 328, 932 S.W.2d 746 (1996) (with respect to 550-word ballot title, length alone would not render the title invalid, but numerous material omissions prevented fair understanding of the amendment, causing the amendment to be struck from the ballot).

While the petitioners and Lane give great emphasis to those portions of the *Crochet* and *Page* opinions that suggest that a lengthy proposed initiative may run the risk of an unacceptable ballot title, both decisions very clearly hold that length is only one consideration in determining the sufficiency of a ballot title. In fact, the court in *Page* and *Crochet* held the respective ballot titles insufficient because material portions of the proposed measures had been omitted and that some of those omissions were important for a fair understanding of the measures and would give the voter "serious ground for reflection" on whether to vote for the measures.

■ In the present case, the Act's ballot title meticulously covered the material matters contained in the text of the Act. In this

respect, our long-settled rule is that a ballot title is sufficient if it recites the general purposes of the proposed initiated act and that the ballot title contains enough information to sufficiently advise electors of the true contents of the proposed act. *Newton v. Hall, Secretary of State*, 196 Ark. 929, 120 S.W.2d 364 (1938); *Lewis v. Hall*, 196 Ark. 115, 116 S.W.2d 353 (1938).

■ In *Bailey v. Hall, Secretary of State*, 198 Ark. 815, 131 S.W.2d 635 (1939), the court was confronted with a ballot title with 900 words, that described a lengthy initiative act which was to establish a workers' compensation commission to administer and to provide funds for the initiative act's administration and to provide the payment of compensation by employers for injuries to, or death of their employees. The *Bailey* court held that, while the 900-word title was very long, the title contained every essential necessary to set out the scope and import of the proposed act. Moreover, in *Newton v. Hall, supra*, the court was faced with a 735-word ballot title that covered a most complex and difficult to understand proposed amendment which provided for the refunding of the State's highway debt. Even though the content of the amendment covered a complicated subject, the court refused to remove the refunding-bond amendment from the ballot because the court's review reflected the title contained references to each section of the amendment and fairly summarized the subject covered in the proposal's respective sections. Consistent with this court's longstanding precedent, we do not hold the Tobacco Settlement Proceeds' ballot title insufficient merely because it is lengthy and covers what the petitioners and Lane characterize as a complex subject.

■ Before departing from this first point, we note our cases that say that many voters will enter the voting booth knowing little about an initiated proposal, and therefore, the title should contain enough information to "convey an intelligible idea of the scope and import of the proposed law." *Gaines v. McCuen*, 296 Ark. 513, 758 S.W.2d 403 (1988). The court has further stated that the title must not be unduly long, since a voter is allowed only five minutes in the voting booth. *Id.; see also* Ark. Code Ann. § 7-5-522 (Repl. 2000).

■ While not fully discussed in this court's decisions, we are compelled to mention other sources from which interested Arkansas voters may educate (and have educated) themselves regarding proposed measures that appear on general election ballots. For

example, the secretary of state is charged with the duty to publish in two weekly issues of some newspaper in each county before the election a notice that the proposed measure(s) will be voted upon by the people and a publication of any such measure(s) must commence eight weeks before the election. Ark. Code Ann. § 7-9-113(a) and (b) (Repl. 2000). At least one notice for all measures must commence eight weeks before the election, and at least one notice shall contain the number, the popular name, the ballot title, and a complete text of the measure to be submitted. Ark. Code Ann. § 7-9-113(b)(2)(B) and (c) (Repl. 2000); *see also* Ark. Code Ann. § 7-5-206 (Repl. 2000) (county board of election commissioners shall make publication of all proposed amendments and other questions certified to it by the secretary of state by posting a list thereof at the courthouse door at least ten days before the election). In addition, election officials in general elections must post in a conspicuous place in the polling areas at least two copies of all constitutional amendments and acts to be voted upon. Ark. Code Ann. § 7-5-302 (Repl. 2000).

While we by no means wish to diminish the importance of the preparation of a ballot title which concisely provides the purpose of the proposed measure, Ark. Code Ann. § 7-9-107 (Repl. 2000), and which can be fairly considered by the voters in the voting booth, it is also significant that the voter has other published means by which any voter can accurately learn the general purposes and fundamental provisions of the proposal(s).

We now consider the more serious issue urged by petitioners and Lane — are there serious material omissions or are there misleading tendencies that cause the ballot title to be deficient? Our review prompts us to say no. We first consider the petitioners' five claims of misleading omissions and then we will review five separate assertions offered by Lane.

██ Petitioners' initial complaint is that the initiated Act changes existing law by amending Ark. Code Ann. § 19-4-803 (Repl. 1998), to exempt the Tobacco Settlement Holding Fund from budgeting and appropriation requirements under that statute. Specifically, petitioners submit that the title does not adequately explain to the voter that § 19-4-803's accounting and budgetary process will be circumvented if the voters approve the initiative act. The petitioners say that the ballot title in issue fails to reveal how or

to what extent the new exemption-of-funds law will alter the state's budget process. However, in reading the Act's title, it is quite clear that the Tobacco Settlement proceeds will be deposited in a Cash Holding Fund which will serve as a cash fund held separate and apart from the state treasury and these proceeds will be transferred to other funds as directed in the initiated Act. The title also specifies that the Act amends § 19-4-803 to exempt the Holding Fund from the normal budgeting and appropriation requirements, and this language quickly dispels the petitioners' notion that the title fails to explain how the state's budget and appropriation process will be affected. Furthermore, the ballot title explains that the settlement proceeds will fund the Arkansas Century Trust Fund (Trust Fund) within the State Treasury to be invested to provide earnings to pay the State Board of Finance to manage the Tobacco Settlement and added health-related uses as directed by the General Assembly. Proceeds not needed to fund the Trust Fund will also be transferred to the Program Fund within the State Treasury and used for programs designated in the Act and described by the ballot title. The title further reveals that the program expenditures are subject to appropriation by the General Assembly, except a cash fund held separate from the State Treasury will be irrevocably pledged to pay debt service on any revenue bonds issued by the State for capital improvement projects named in the Act. In sum, the title simply could add little more in detail to explain how the settlement proceeds will be utilized by the State unless it printed the entire Act, which it obviously is not required to do.

Petitioners next argue that the proposed Act attempts to give the impression that the anticipated settlement proceeds will be expended on tobacco-related and health issues but the bioscience provisions of the Act have nothing to do with those issues. They suggest this fact is masked by omitting from the ballot title any explanation of this point. It is difficult to discern from petitioners' argument if their problem is with the Act or the ballot title. Regardless, our review of the title — which is our duty here — reveals that the title covers all material aspects of the Act that involve the creation of an Arkansas Biosciences Institute and the establishment of its board which will have the authority to make research grants. As CHART points out, the Institute will be a cooperative venture of specified organizations that is to conduct research with 22.8% of the tobacco settlement proceeds. Petitioners

simply fail in their burden to show that any material omissions exist that somehow make the ballot title misleading.

 Petitioners' third point involves section 3 of the Act, which they claim is largely omitted from the ballot title. Their example is that section 3(f) empowers the State Board of Finance "to perform all other tasks that may be assigned it"; however, they complain that no other tasks are mentioned. Again, petitioners fail to suggest exactly how the voter is misled when the State Board of Finance, an existing state entity, and its authority are thoroughly described in the ballot title. The title unveils the Board's authority by stating the Board is to manage the tobacco settlement proceeds and additional health-related issues as directed by the general assembly, and it shall invest the Holding Fund, Program Fund, and related accounts, and Settlement Fund in the same manner as other State Treasury funds and invest those funds, including the Trust Fund and Debt Services Fund, in accordance with the prudent-investor standard.

 In their fourth point, petitioners emphasize that, within thirty days of receipt of monies deposited into a Prevention and Cessation Program Account, fifteen percent of those monies must be placed in a special account to be expended for tobacco prevention and cessation programs in minority communities as directed by certain specified officials. They argue that the fifteen percent figure is omitted from the ballot title and that omission prevents the voter from understanding that a specific sum is committed to a specific community. While petitioners are correct that the title does not mention the fifteen percent number, it does provide that 31.6% of the annual excess proceeds shall be transferred to the Program Fund and that 15.8% goes to the Targeted State Needs Programs that include a *Minority Health Initiative addressing health problems disproportionately affecting minorities (23%)*. (Emphasis added.) In reading the ballot title, no mistake exists over the fact that, when the tobacco proceeds are received, minority communities are specified beneficiaries of these proceeds. In short, we fail to see how the omission of the fifteen percent number alone in any way misleads the voter when the voter is fully apprised that minority communities will be favored with designated amounts.

Finally, petitioners argue that the Act contains confusing and conflicting provisions relating to the issue of bonds. They point out

that section 6(d) deals with debt service involving tobacco settlement revenue bonds and provides that the settlement revenues are to be used to secure bonds for specified improvement projects described in the Act, and that the State Department of Finance Authority may determine that a lien be given on these projects. However, petitioners assert that the Act further provides that in no event shall the bonds constitute an indebtedness of the State. Lastly, petitioners urge that a voter reading the ballot is going to be misled because the title fails to reflect that there is a possibility that a lien could be placed on any project built under the Act if it is passed.

■ Once again, it is unclear whether the petitioners are complaining about the Act and its validity or over the ballot title. Certainly, the proposed Act does mention that the revenue bonds issued under it may additionally be secured by a lien on the building projects if so determined by the State Finance Authority. However, the Act equally provides that the revenue bonds shall be obligations only of the State Finance Authority and do not constitute an indebtedness of the State. This being so, the ballot title's failure to mention the lien language in section 6(e) is of little import. Suffice it to say that the ballot title does make it clear to the voter that cash fund monies from the tobacco settlement are to be kept separate from the State Treasury and irrevocably pledged to pay debt service on any revenue bonds, and that any proceeds in the debt-service account not needed to pay services will then be transferred to the Trust Fund. We believe the language in the ballot title provides a fair understanding of the scope and import of the Act, and for these reasons, we reject the petitioners' request to determine the title deficient.

■ We now consider Lane's charge that certain omissions from, and deceptions and lack of clarity in, the ballot title, ring the death knell of the proposed measure. In his first point, Lane states that section 4 of the proposal prevents the General Assembly from appropriating funds held in the Cash Holding Fund, but such is not disclosed in the ballot title. He posits whether it is fair to ask whether a voter would deem it material to his or her decision in voting for or against the Act if the voter knew the General Assembly could not touch the monies in the Tobacco Settlement Cash Holding Fund? Lane's question itself is misleading. As we have already gone to great lengths to point out in our earlier discussion of the petitioners' arguments, the Act's ballot title designates that

the settlement proceeds shall be deposited in the Tobacco Settlement Cash Holding Fund, which is a cash fund separate from the State Treasury, and those proceeds will be transferred to other funds as directed in the Act. That being disclosed, the title further reveals that the first $100,000,000 of the proceeds will fund the Trust Fund within the State Treasury and annual proceeds will be transferred and allocated to the Program Fund *provided that such expenditures are subject to appropriation by the General Assembly.* (Emphasis added.) On the other hand, the title further provides that the cash funds separately deposited and pledged to pay debt service on revenue bonds will not be appropriated.[3]

▇ In his second argument, Lane states that the Act describes the Arkansas Healthy Century Trust Fund (Trust Fund) as a perpetual trust, but the ballot title refers to it as a revocable trust subject to amendment. Lane fails to mention how this point is materially misleading. The text of section 7(b) refers to the Trust Account as a perpetual trust and also as revocable and subject to amendment — which CHART says is not necessarily conflicting. In any event, the title, in using the word revocable, merely utilized the same wording found in the Act. Lane simply fails to establish any misleading tendency in this respect that would cause us to believe the Act should be removed from the ballot.

▇ Lane's third point is whether the ballot title must disclose that all of the proceeds of the Tobacco Settlement Fund are irrevocably committed to be spent as set out by the proposed Act. Lane's argument is unavailing. As we mentioned earlier, the ballot title correctly reflects that, under the Act, the General Assembly has the power of appropriation over all expenditures except debt-services funds. Clearly, if the ballot title was worded to say the Settlement Fund proceeds are irrevocably committed to be allocated by the Act, the title would be wrong.

▇ We next consider what may be considered another point Lane makes by asking, "How can the voter make an informed decision about future expenditures without knowing future income?" Again, Lane makes no real argument or offers any citation of authority concerning how not having exact settlement income

---

[3] Although earlier mentioned, we note that amounts in the Debt Services Fund not needed to pay debt service shall be transferred to the Trust Fund.

amounts might mislead the voters. As this court has repeatedly stated, it is the challenger's burden to show that the ballot title is misleading and defective. We would say, however, that at this stage, no one knows how much money, if any, the State will receive under the National Tobacco Settlement, and as CHART argues, it would be misleading for the ballot title to suggest an amount. We agree. Also, we would note that the General Assembly itself has enacted laws creating programs only to find later that no funds were available to put the programs into action. Knowing that these possibilities exist, the Act forthrightly provides that its allocations and other actions under the Act are dependent upon the State receiving settlement proceeds.

Although not set out as a separate argument, Lane also contends that the ballot title is misleading because sections 2 and 3 of the proposed Act are not mentioned in the ballot title. Section 2 is the Act's definition provision. He complains that the voter must know the terms listed in the section or he or she will find the ballot title confusing. In making this argument, Lane refers to abbreviations used in place of certain state organizations, such as ADFA (Arkansas Development Finance Authority); he further questions whether voters can understand terms, such as the Program Fund and Holding Fund and others. However, in reading the ballot title, these organizations are formally named and the various terms to which Lane makes reference are used in the context of how the State will utilize any settlement proceeds it will receive. Although Lane (and two dissenting justices) are of the opinions that Arkansas voters cannot educate themselves so as to understand the initiative Act placed before them, we take note that this is not the first lengthy and complex measure placed before an Arkansas electorate. As discussed more fully above, such lengthy and complex ballots were given the Arkansas electorate by this court in *Bailey*, 198 Ark. 815, 131 S.W.2d 635, and *Newton*, 196 Ark. 929, 120 S.W.2d 364. And here again, as was the case in *Newton*, "we have an amendment which deals only with [a] single question," *Newton*, 196 Ark. at 948, which helps confirm our confidence in our voters' ability to understand this ballot title.

Lane's suggestion in his argument that section 3 was not mentioned in the ballot title is an apparent mistake. Section 3 is labeled, GRANT OF AUTHORITY TO STATE BOARD OF FINANCE, and the section sets out the Board's duties relative to

the tobacco settlement. Suffice it to say that the State Board of Finance is mentioned repeatedly throughout the Act's ballot title, and the Board's various duties regarding the settlement proceeds are specifically provided.

 We hold that, while the ballot title is long, it sufficiently recites the general purposes of the proposed Act and contains fair and understandable language from which the voters can consider the Act's content, scope, and import. In this same vein, we further conclude that no material omissions or misleading tendencies result from the ballot title's wording that should thwart a fair understanding of the Act's purposes.

 In conclusion, we note that at oral argument, both the representative from the Attorney General's office and counsel for CHART advanced the argument that Amendment 7 of the Arkansas Constitution sets no time limit on a voter's consideration of a proposed initiative. Under their theory, there is no time limitation on voting on proposed measures because it runs contrary to Amendment 7. Thus, a ballot title of 20,000 words could be offered under the protection of Amendment 7. That, with all due respect, makes no sense. Surely Amendment 7 was not meant to bog down the election process in a quagmire of words. We recognize that, at some point, length and complexity alone might militate against a voter's ability to form an intelligent opinion about the issue at hand. However, that has not occurred with respect to the ballot title at issue. While the ballot title can be said to have staked out the outer limits for length and complexity, we cannot say those limits have been exceeded here.

The mandate herein will issue within five days from the filing of this opinion unless a petition for rehearing is filed.

Petition denied.

BROWN, J., concurs; CORBIN and THORNTON, JJ., dissent; SMITH, J., not participating.

The following is the complete text of the ballot title of the Initiated Act:

*ADDENDUM*

*BALLOT TITLE*

An Act establishing funds and accounts for the deposit, investment and management of proceeds to be received by the State from the Master Settlement Agreement between various states and tobacco manufacturers (the "Tobacco Settlement"); and providing that the funds and accounts will be managed by the State Board of Finance;

Providing that all Tobacco Settlement proceeds shall be deposited in the Tobacco Settlement Cash Holding Fund (the "Holding Fund"), which will be a cash fund held separate and apart from the State Treasury, and that proceeds will be transferred from the Holding Fund to the other funds as directed in this Act;

Providing that the first $100,000,000 of Tobacco Settlement proceeds received by the State will fund the Arkansas Healthy Century Trust Fund (the "Trust Fund") within the State Treasury as a revocable trust subject to amendment, to be invested for use in the future; providing that earnings on the Trust Fund shall be used only to pay costs of the State Board of Finance in managing the Tobacco Settlement and additional health-related uses as directed by the General Assembly;

Providing that in 2001, any Tobacco Settlement proceeds received by the State and not needed to fund the Trust Fund to its initial endowment level will be transferred to the Tobacco Settlement Program Fund (the "Program Fund") within the State Treasury and used for the programs described below;

Providing that beginning in 2002 and in each year thereafter, Tobacco Settlement proceeds shall be divided as follows:

(1) the first $5,000,000 received in each year will be transferred to the Tobacco Settlement Debt Service Fund (the "Debt Service Fund"), a cash fund held separate and apart from the State Treasury and irrevocably pledged to pay debt service on Tobacco Settlement Revenue Bonds (the "Revenue Bonds"); providing that annual transfers to the Debt Service Fund shall be perpetual, but that amounts in the Debt Service Fund not needed to pay debt

service shall be transferred to the Trust Fund; and providing that Revenue Bonds will be issued by the Arkansas Development Finance Authority for the following capital improvement projects:

(a) University of Arkansas for Medical Sciences ("UAMS") Biosciences Research Building in a principal amount not to exceed $25,000,000;

(b) Arkansas State University ("ASU") Biosciences Research Building in a principal amount not to exceed $20,000,000;

(c) School of Public Health in a principal amount not to exceed $15,000,000; and

(d) any other capital improvement projects related to health subsequently designated by the General Assembly;

(2) the remaining proceeds received each year shall be transferred to the Program Fund and used to pay for the following programs in the following percentages, provided, however, that such expenditures are subject to appropriation by the General Assembly:

(a) 31.6% to Prevention and Cessation Programs administered by the Arkansas Department of Health ("ADH"), which shall allocate money and make grants to prevent tobacco use and assist in cessation of tobacco use;

(b) 15.8% to the Targeted State Needs Programs, to be established by UAMS, with funds distributed among (i) a new Arkansas School for Public Health on the campus of UAMS (33%), (ii) a new Area Health Education Center to serve eastern Arkansas (22%); (iii) programs providing ·health services to the elderly through the Donald W. Reynolds Center on Aging (22%), and (iv) a Minority Health Initiative addressing health problems disproportionately affecting minorities (23%);

(c) 22.8% to the Arkansas Biosciences Institute, a cooperative venture among the University of Arkansas, Division of Agriculture, UAMS, the University of Arkansas, Fayetteville, Arkansas Children's Hospital, and ASU, to conduct research; and

(d) 29.8% for the Medicaid Expansion Program, to be administered by the Arkansas Department of Human

Services ("DHS") to increase Medicaid benefits and services;

Providing that the State Board of Finance shall invest all amounts in the Holding Fund, the Program Fund and related accounts, and the Arkansas Tobacco Settlement Commission Fund (the "ATSC" fund) in the same manner as other State Treasury funds, and shall invest the Trust Fund and the Debt Service Fund pursuant to a prudent investor standard;

Creating the Arkansas Tobacco Settlement Commission (the "ATSC") to monitor and evaluate the programs funded from Tobacco Settlement proceeds; providing that the ATSC shall be comprised of the directors or their designees of the Arkansas Science and Technology Authority ("ASTA"), the Department of Education, the Department of Higher Education, DHS, and ADH, two healthcare professionals (one selected by the Senate President Pro Tempore and one by the Speaker of the House), and two citizens (one selected by the Governor and one by the Attorney General); and providing that earnings on the Program Fund and the program accounts shall be transferred to the ATSC Fund to be used to pay expenses of the ATSC and fund ATSC grants;

Creating the Arkansas Biosciences Institute and establishing that its board has the authority to make research grants and will be comprised of the following: the president of the University of Arkansas ("UA"), the president of Arkansas State University, the chancellor of UAMS, the chancellor of UA, Fayetteville, the vice president of agriculture of UA, the director of the ASTA, the director of the National Center for Toxicological Research, the president of Arkansas Children's Hospital, and two persons possessing scientific, academic or business qualifications appointed by the Governor;

Creating the Arkansas School of Public Health;

Creating an Advisory Committee to the Arkansas Board of Health to provide recommendations on prevention and cessation programs;

Establishing specific guidelines for evaluating each program funded under this Act;

Amending Ark. Code Ann. § 19-4-803 to exempt the Holding Fund from normal budgeting and appropriation requirements;

Directing the Director of DHS to commence Medicaid expansion from available funds prior to receipt of Tobacco Settlement proceeds;

Directing the Director of DHS to spend $600,000 during the biennial period ending June 30, 2001 to offset federal cuts in the Meals on Wheels program;

Declaring the provisions of this Act to be severable; and repealing all laws and parts of laws in conflict with this Act.

BROWN J., concurs.

ROBERT L. BROWN, Justice, concurring. I agree with the majority opinion that Initiated Act No. 1 should remain on the ballot and that it is not impermissibly long or complex. However, I also agree that Amendment 7 to the Arkansas Constitution does not authorize open-ended and unlimited ballot titles with the length and complexity of *War and Peace* to be submitted to a vote of the people. That is what the proponents of the initiated act claim, but in my judgment they are wrong.

My purpose in writing is to emphasize that the majority opinion does not reach the issue of whether the authority of the General Assembly to appropriate and budget state funds has been usurped by the Executive Branch in the proposed initiated act. Stated differently, we do not address whether the separation-of-powers doctrine as established by the Arkansas Constitution has been trumped by this proposal. Certainly, that allegation was made in the original action petition by the Walker proponents, but the point was not developed in either the Walker brief or in the brief of the intervenor. The failure to develop and argue this issue constitutes an abandonment of it. *Stilley v. Priest*, 341 Ark. 329, 16 S.W.3d 251 (2000).

But even had the separation-of-powers issue been developed before this court, we could not address it at this stage. Prior to the amendment's enactment, any opinion rendered by this court on this constitutional issue would be advisory in nature, and we have refrained in the past from issuing advisory opinions on constitu-

tional issues before an initiative's adoption. *See, e.g., Plugge v. McCuen*, 310 Ark. 654, 841 S.W.2d 139 (1992); *see also Donovan v. Priest*, 326 Ark. 353, 931 S.W.2d 119 (1996). In the event that the people of this state enact the proposed initiated act by majority vote on November 7, 2000, then the issue of whether the powers of the General Assembly have been unlawfully usurped will be ripe for our consideration.

D ONALD L. CORBIN, Justice, dissenting. I respectfully disagree with the majority's holding that the ballot title, which spans 994 words and purports to summarize an act comprised of twenty-three different sections, sufficiently conveys the act's content, scope, and import. In my opinion, the excessive length of the title combined with the fact that it fails to convey to the voters the true ramifications of the proposed act renders the ballot title insufficient.

While I agree with the majority that length alone will not render a ballot title insufficient, I believe that the length of this ballot title is so excessive and complicated that the voter will not have sufficient time to read and digest it within the time allotted by statute for casting his or her vote. When a voter enters the voting booth, he has five minutes to read, comprehend, and make an informed decision with regard to this proposed act and any other proposed amendments, as well as make choices among a host of local, state, and federal candidates. This court has previously recognized that a ballot title must not be unduly long because the voter is subject to time constraints while in the voting booth. *See Christian Civic Action Comm. v. McCuen*, 318 Ark. 241, 884 S.W.2d 605 (1994); *Gaines v. McCuen*, 296 Ark. 513, 758 S.W.2d 403 (1988). The majority attempts to avoid the problem of this title's excessive length by pointing out that voters have opportunities to educate themselves about this act prior to entering the voting booth. This generalization ignores the fact that this court has long "regarded as axiomatic that the majority of voters, when called upon to vote for or against a proposed measure at a general election, will derive their information about its contents from an inspection of the ballot title immediately before exercising the right of suffrage." *Christian Civic Action Comm.*, 318 Ark. at 245, 884 S.W.2d at 607. Because its excessive length prohibits the voter from fully reading and comprehending the proposed act, the ballot title fails to adequately inform the voter of the consequence of voting for the proposal.

Specifically, the ballot title fails to notify the voters that this proposal circumvents the notion of separation of powers by infringing upon the legislature's authority of appropriation. To fully understand my complaint, a little history of this proposal is informative. The Governor proposed this use of the tobacco settlement to the General Assembly, the body responsible for budgeting and appropriating state funds. After lengthy debate back and forth, the General Assembly rejected the Governor's proposal. The Governor has now chosen to make an end run around the legislature by asking the voters of this state to approve an act that their own representatives rejected. The proposal, as now presented as Proposed Initiated Act No. 1, fails to adequately inform the voters that the funds from the tobacco settlement will not be spent or appropriated in the normal course of business.

I agree that the ballot title reveals that the settlement cash will be held in a holding fund separate from the state treasury. The ballot title does not, however, sufficiently convey to the voter that this is a significant change in the way that state monies are ordinarily handled. The ballot title is organized in such a manner that defeats this purpose. For example, the creation of the holding fund separate from the state treasury is located near the beginning of the ballot title, while the provision amending Ark. Code Ann. § 19-4-803 (Repl. 1998) and exempting the holding fund "from normal budgeting and appropriation requirements" is hidden within the last eighty-five words of the 994 word title. In this respect, the length of the ballot title hinders the voters' ability to be fully informed of the sweep of this measure.

Moreover, I disagree that the scant information provided in the ballot title sufficiently notifies the voter of the potential impact of this proposal. Stating that the holding fund will be exempt from normal budgetary procedures is not the same as telling the voter that the General Assembly, comprised of elected officials, is prohibited from appropriating any money placed into the holding fund. The ballot title is also misleading in that it states that some expenditures are subject to appropriations by the General Assembly, whereas the text of the act reflects that all monies received as a result of the settlement will first go into this holding fund, which is not under the control of the General Assembly, and will then be divided out among various other funds.

I agree with Petitioners that in light of the fact that there is over $1.6 billion dollars at stake, the voter is entitled to an explanation of exactly how the appropriation process is being changed. I am further troubled that if the settlement funds are not subjected to the normal budgeting and appropriation requirements, there will be little or no accountability as to how the funds are spent. Ordinarily, there is ample accountability when the legislature is in charge of appropriating funds, *i.e.*, there is robust debate between the various representatives and senators, who have undoubtedly received input from their constituents, and the matter must be approved by both houses. Here, however, there is no indication that the board in charge of appropriating the settlement funds will be subject to such accountability. This is something that the voters should know. Such information is a material fact that would give the voter "serious ground for reflection" on whether to vote for this proposed act. This omission of a material fact, coupled with its excessive length and complexity, renders this ballot title deficient.

I respectfully dissent.

THORNTON, J., joins in this dissent.