Mr. Oscar Stilley, Attorney at Law Central Mall Plaza Suite 516 5111 Rogers Avenue Fort Smith, AR 72903-2041
Dear Mr. Stilley:
This is in response to your request for certification, pursuant to A.C.A. § 7-9-107 (Repl. 2000), of the following popular name and ballot title for a proposed amendment to the Arkansas Constitution, as follows:
 Popular Name AN AMENDMENT TO ABOLISH THE AD VALOREM TAXES ON PERSONAL PROPERTY AND UTILITY PROPERTY, TO REPEAL THE $300 PROPERTY TAX CREDIT FOR HOMESTEADS AND THE ½% STATEWIDE SALES AND USE TAX IMPOSED TO OFFSET THE REVENUE LOSSES CAUSED BY THE PROPERTY TAX RATES, BY INITIATIVE PETITION, TO ELIMINATE ALL MINIMUM MILLAGE RATES FOR PROPERTY TAXES, PROVIDE FOR EQUALITY IN DISTRIBUTION OF STATE FUNDS FOR PUBLIC SCHOOLS, REMOVE THE 3 MILL CAP ON COUNTY ROAD TAXES, AND FOR OTHER PURPOSES
 Ballot Title AN AMENDMENT TO THE ARKANSAS CONSTITUTION ABOLISHING ALL AD VALOREM TAXES ON PERSONAL PROPERTY OR UTILITY PROPERTY BY THE STATE OF ARKANSAS OR ANY OF ITS POLITICAL SUBDIVISIONS, INCLUDING, BUT NOT LIMITED TO, COUNTY AND MUNICIPAL GOVERNMENT, SCHOOL DISTRICTS, IMPROVEMENT DISTRICTS, FIRE, LIBRARY OR SERVICE DISTRICTS, AFTER DECEMBER 31, 2002, EXCEPT TO THE EXTENT NECESSARY TO PREVENT THE IMPAIRMENT OF BONDED INDEBTEDNESS EXISTING PRIOR TO THE ENACTMENT OF THIS AMENDMENT; REPEALING THE EXISTING HOMESTEAD AD VALOREM REAL PROPERTY TAX CREDIT OF $300; REPEALING THE HALF PERCENT (½%) STATEWIDE SALES AND USE TAX LEVIED TO OFFSET THE FINANCIAL IMPACT OF SAID TAX CREDIT; PROVIDING THAT THE PEOPLE MAY PROPOSE CHANGES IN THE MILLAGE RATES IMPOSED BY POLITICAL SUBDIVISIONS OF THE STATE OF ARKANSAS, INCLUDING BUT NOT LIMITED TO COUNTY AND MUNICIPAL GOVERNMENTS, SCHOOL DISTRICTS, IMPROVEMENT DISTRICTS, FIRE, LIBRARY OR SERVICE DISTRICTS, AND ANY OTHER LOCAL TAX IMPOSED BY OR FOR ANY OF THE DESCRIBED ENTITIES, BY THE INITIATIVE PROCESS, IN THE SAME MANNER AS OTHER LOCAL INITIATIVES, UPON THE SIGNATURES OF TEN PERCENT (10%) OF THE VOTERS WITHIN THE TAXING UNIT, CALCULATED AS FOLLOWS: FOR SCHOOL TAXES, TEN PERCENT (10%) OF THE WHOLE NUMBER OF VOTES TABULATED IN THE MOST RECENT SCHOOL ELECTIONS IN THE SCHOOL DISTRICT, UPON THE MILLAGE RATE; FOR CITIES, TEN PERCENT (10%) OF THE PERSONS WHO VOTED FOR MAYOR IN THE MOST RECENT GENERAL ELECTION FOR MAYOR; FOR COUNTY TAXES, TEN PERCENT (10%) OF THE VOTES CAST IN THE MOST RECENT GENERAL ELECTION FOR CIRCUIT CLERK; AS TO ANY OTHER TAXING UNIT, AND AS TO ANY TAXING UNIT IN WHICH THE MOST RECENT MEASURING RACE WAS NOT TABULATED, ON THE SIGNATURES OF THE LESSER OF TEN PERCENT (10%) OF THE WHOLE NUMBER OF VOTERS REGISTERED WITHIN THE TAXING UNIT, OR 100 VOTERS OF THE TAXING UNIT; ESTABLISHING PROCEDURES FOR THE CALLING OF SUCH ELECTIONS; PROVIDING THAT IF MORE THAN ONE RATE OF TAX IS PROPOSED, THE HIGHEST RATE RECEIVING THE AFFIRMATIVE VOTE OF A MAJORITY OF THE VOTES CAST UPON THE QUESTION SHALL BE CERTIFIED AS THE LEGAL RATE; PROVIDING THAT ALL PROPOSED TAX INCREASES OR DECREASES SHALL BE PRESENTED TO THE VOTERS AT REGULARLY SCHEDULED STATEWIDE GENERAL ELECTIONS, AND NOT OTHERWISE, AFTER THE HOLDING OF THE FIRST REGULARLY SCHEDULED STATEWIDE GENERAL ELECTION IN WHICH THE TAX MIGHT BE INCREASED OR DECREASED, SUBSEQUENT TO THE EFFECTIVE DATE OF THIS AMENDMENT; PROVIDING RULES TO PREVENT THE IMPAIRMENT OF THE SECURITY OF BONDHOLDERS IN CASE OF THE REDUCTION OF MILLAGE RATES; PROVIDING THAT WHERE ALL OR NEARLY ALL THE PROPERTY TAXES WITHIN A COUNTY ARE ABOLISHED, THE POSITIONS OF TAX ASSESSOR AND TAX COLLECTOR SHALL BE ABOLISHED OR CONSOLIDATED WITH OTHER OFFICES, AS SOON AS PRACTICABLE; ABOLISHING ALL MINIMUM MILLAGE RATES; PROVIDING THAT NEITHER THE STATE NOR ITS SUBDIVISIONS SHALL BE REQUIRED TO MAINTAIN ANY PARTICULAR LEVEL OF EDUCATION FUNDING; PROVIDING THAT STATE FUNDS FOR PRIMARY AND SECONDARY EDUCATION SHALL BE DISTRIBUTED EQUALLY ON A PER PUPIL BASIS, WITH RESPECT TO ALL STUDENTS OF A GIVEN AGE GROUP, UNLESS OTHERWISE REQUIRED BY LAW SUPERIOR TO THIS CONSTITUTION; PROVIDING THAT FUNDING OF CHARTER SCHOOL OR VOUCHER STUDENTS, IF ANY, SHALL BE GOVERNED BY LAW OR CONSTITUTIONAL AMENDMENT, AS THE CASE MAY BE; AUTHORIZING SUPPLEMENTAL FUNDING FOR HANDICAPPED STUDENTS; PROHIBITING THE STATE FROM PUNISHING OR REWARDING VOTERS FOR THE TAXES THAT THEY VOTE OR FAIL TO VOTE UPON THEMSELVES; PROVIDING THAT ALL PROPERTY TAX REVENUES SHALL REMAIN THE PROPERTY OF THE TAXING UNIT IN WHICH THE TAXED PROPERTY LIES, EXCEPT THAT WHERE ONE PARCEL OF REAL PROPERTY LIES IN MORE THAN ONE TAXING UNIT, PROPORTIONATE DISTRIBUTION SHALL BE MADE; ELIMINATING THE THREE (3) MILL MAXIMUM FOR COUNTY ROAD TAX MILLAGES, WHERE THE MILLAGE IN EXCESS OF THREE (3) MILLS IS APPROVED BY THE VOTERS AS PROVIDED HEREIN; PROVIDING THAT NOTHING HEREIN SHALL SUPERSEDE ANY ABOLITION OF THE PROPERTY TAX BY POPULAR VOTE ON INITIATIVE AMENDMENT, EXCEPT AS TO PROPERTY TAXES VALIDLY PLEDGED AS SECURITY FOR BONDED INDEBTEDNESS, REGARDLESS OF THE RESPECTIVE VOTES UPON THE MEASURES; PROVIDING FOR LIBERAL CONSTRUCTION IN FAVOR OF THE TAXPAYER, SEVERABILITY, AND GENERAL REPEALER OF CONFLICTING PROVISIONS; PROVIDING THAT THE AMENDMENT IS SELF-EXECUTING AND SHALL TAKE EFFECT JANUARY 1, 2003, EXCEPT AS OTHERWISE PROVIDED; AND FOR OTHER PURPOSES.
The Attorney General is required, pursuant to A.C.A. § 7-9-107, to certify the popular name and ballot title of all proposed initiative and referendum acts or amendments before the petitions are circulated for signature. The law provides that the Attorney General may substitute and certify a more suitable and correct popular name and ballot title, if he can do so, or if the proposed popular name and ballot title are sufficiently misleading, may reject the entire petition.
A.C.A. § 7-9-107 neither requires nor authorizes this office to make legal determinations concerning the merits of the act or amendment, or concerning the likelihood that it will accomplish its stated objective. Consequently, this review has been limited to a determination, pursuant to the guidelines that have been set forth by the Arkansas Supreme Court, discussed below, of whether the proposed popular name and ballot title accurately and impartially summarize the provisions of your proposed amendment or act.
The purpose of my review and certification is to ensure that the popular name and ballot title honestly, intelligibly, and fairly set forth the purpose of the proposed amendment or act. See Arkansas Women's PoliticalCaucus v. Riviere, 282 Ark. 463, 466, 677 S.W.2d 846 (1984).
The popular name is primarily a useful legislative device. Pafford v.Hall, 217 Ark. 734, 233 S.W.2d 72 (1950). It need not contain detailed information or include exceptions that might be required of a ballot title, but it must not be misleading or give partisan coloring to the merit of the proposal. Chaney v. Bryant, 259 Ark. 294, 532 S.W.2d 741
(1976); Moore v. Hall, 229 Ark. 411, 316 S.W.2d 207 (1958). The popular name is to be considered together with the ballot title in determining the ballot title's sufficiency. Id.
The ballot title must include an impartial summary of the proposed amendment or act that will give the voter a fair understanding of the issues presented. Hoban v. Hall, 229 Ark. 416, 417, 316 S.W.2d 185
(1958); Becker v. Riviere, 270 Ark. 219, 223, 226, 604 S.W.2d 555
(1980). According to the court, if information omitted from the ballot title is an "essential fact which would give the voter serious ground for reflection, it must be disclosed." Bailey v. McCuen, 318 Ark. 277, 285,884 S.W.2d 938 (1994), citing Finn v. McCuen, 303 Ark. 418, 798 S.W.2d 34
(1990); Gaines v. McCuen, 296 Ark. 513, 758 S.W.2d 403 (1988); Hoban v.Hall, supra; and Walton v. McDonald, 192 Ark. 1155, 97 S.W.2d 81 (1936). At the same time, however, a ballot title must be brief and concise (see
A.C.A. § 7-9-107(b)); otherwise voters could run afoul of A.C.A. §7-5-522's five-minute limit in voting booths when other voters are waiting in line. Bailey v. McCuen, supra. The ballot title is not required to be perfect, nor is it reasonable to expect the title to cover or anticipate every possible legal argument the proposed measure might evoke. Plugge v. McCuen, 310 Ark. 654, 841 S.W.2d 139 (1992). The title, however, must be free from any misleading tendency, whether by amplification, omission, or fallacy; it must not be tinged with partisan coloring. Id. A ballot title must convey an intelligible idea of the scope and significance of a proposed change in the law. Christian CivicAction Committee v. McCuen, 318 Ark. 241, 884 S.W.2d 605 (1994). It has been stated that the ballot title must be: 1) intelligible, 2) honest, and 3) impartial. Becker v. McCuen, 303 Ark. 482, 798 S.W.2d 71 (1990), citing Leigh v. Hall, 232 Ark. 558, 339 S.W.2d 104 (1960).
Having analyzed your proposed amendment, as well as your proposed popular name and ballot title under the above precepts, it is my conclusion that I must reject both your proposed popular name and ballot title due to ambiguities in the text of your proposed measure. A number of additions or changes to your proposed popular name and ballot title are, in my view, necessary in order to more fully and correctly summarize your proposal. I cannot, however, at this time, fairly or completely summarize the effect of your proposed measure to the electorate in a popular name or ballot title without the resolution of the ambiguities. I am therefore unable to substitute and certify a more suitable and correct popular name and ballot title pursuant to A.C.A. § 7-9-107(b).
Before addressing the specific ambiguities in the text of your proposed amendment, I will note for your guidance that I am troubled by the length of your proposed ballot title, which comprises 835 words. As I advised you in Ark. Op. Att'y Gen. No. 99-197 with respect to another proposed amendment:
 The longest title approved by the Arkansas Supreme Court contained 900 words. Bailey v. Hall, Secretary of State, 198 Ark. 815, 131 S.W.2d 635
(1939). There were no serious omissions or fallacious statements in that ballot title, which summarized a referendum on a workers' compensation law passed by the General Assembly. In the years after the Bailey decision, however, the court has struck down titles of lesser length, when accompanied by any omissions or misleading tendencies. See, e.g., Crocket v. Priest, supra (1,000 word title struck down); Scott v. Priest, 326 Ark. 328, 932 S.W.2d 746 (1996) (550 word title not invalid on length alone, but this factor plus serious omissions defeated title); Christian Civic Action Committee v. McCuen, supra (709 word title struck down with length as a major factor when viewed in light of other defects); and Dust v. Riviere, supra (727 word title invalid as too lengthy, complex, misleading and confusing). See also, Hoban v. Hall, Secretary of State, 229 Ark. 416, 316 S.W.2d 185 (1958) (text of proposed measure itself was of such extreme length and touched upon so many different subjects that ballot title did not sufficiently cover its provisions); and Newton v. Hall, Secretary of State, supra
(735 word title upheld, but noted length as a potential problem).
 The most recent ballot title upheld by the Arkansas Supreme Court contained 482 words. See Parker v. Priest, 326 Ark. 123, 930 S.W.2d 322
(1996). The court has, as noted previously, upheld titles as long as 900 words (Bailey v. Hall), and 735 words (Newton v. Hall). These decisions, however, were each decided decades ago, and more recent decisions appear to scrutinize the length of such proposals more closely.
In my opinion, the court might well reject your proposed your ballot title based on its length, considered together with its complexity, the number of issues it addresses and the internal inconsistencies discussed immediately below.
I appreciate that the length of your ballot title in part reflects the complexity of your proposed amendment, which addresses a variety of issues. As I have done before, I must warn you of the particular hazards attendant to the ballot title of a lengthy and complex proposal such as yours. The ballot title for such a measure must avoid both the danger of being too lengthy and the danger of having serious omissions. More specifically, the title cannot be so lengthy as to cause voters to violate the voting booth time limitations, yet it must not omit any of the proposed measure's important factors. For this reason, I must point out that with any proposed amendment of considerable length and complexity such as yours, the sponsor runs the risk of a challenge and of a finding by the court that the ballot title is unacceptable, either because it is too "complex, detailed, and lengthy," or because it has "serious omissions." See, e.g., Page v. McCuen, 318 Ark. 342, 884 S.W.2d 951
(1994). See also, Walker v. Priest, 342 Ark. 410, 29 S.W.3d 657 (2000). This concern may be increased where the measure covers more than one subject matter area. See e.g., Walker v. Priest, supra, (upholding the "CHART" tobacco settlement act ballot title, but stating that ". . . here again, as was the case in Newton, [Newton v. Hall, 196 Ark. 929,120 S.W.2d 364 (1938)] `we have an amendment which deals only with [a] single question,' Newton, 196 Ark. at 948, which helps confirm our confidence in our voters' ability to understand this ballot title.")
In my opinion, the numerous ambiguities in the text of your proposed amendment may be a function of its daunting complexity. Among these ambiguities are the following:
 1. Section 1 of your proposed amendment prohibits the imposition of any ad valorem tax upon personal property or" utility property" after December 31, 2001, "except to the extent necessary to prevent the impairment of bonded indebtedness existing prior to the enactment of this amendment." Despite the fact that you characterize the proposed amendment as "self-executing," Section 9, you have provided no details regarding the mechanisms for determining bonded indebtedness and apportioning the tax liability to retire such indebtedness. Section 1 is further ambiguous in that you fail to define the term "utility property," which as used might be taken to apply exclusively to personalty.
 2. In Section 2 of your proposed amendment, you fail to specify the constitutional or statutory law you propose to repeal.
 3. Subsection 3(a) of your proposed amendment begins with the following clause: "The people may propose changes in the millage rates for ad valorem taxes on real property for any of the political subdivisions of the State of Arkansas. . . ." This clause is ambiguous in that it might be read as referring either to property owned by political subdivisions of the state or to real property to be assessed for the benefit of political subdivisions of the state.
 4. Subsection 3(a) further provides that "[t]he people may propose changes in the millage rates . . . in the same manner as other local initiatives. . . ." This statement is misleading in that the procedures you itemize for proposing changes in millage rates for various purposes are not the same as those mandated for local initiatives in Ark. Const. amend. 7. Specifically, the percentages of voter signatures you recite as required on petitions to place various initiatives on the ballot are lower than those required under Amendment 7.
 5. Subsection 3(a) further provides: "The rights specified herein shall not supercede [sic] the existing right of any taxing entity to propose millage or other tax rates, for the consideration of the voters at any regularly scheduled statewide general election." This provision is confusing in that it implies, but never states directly, that the referenced "existing right of any taxing entity to propose millage or other tax rates" will constitute a political subdivision's sole
authority with respect to the imposition of taxes — i.e., that no "taxing entity" will henceforth be authorized to impose a tax without voter approval. Moreover, this subsection is doubly ambiguous in that while the reference to "other tax rates" suggests that this restriction on a political subdivision's power to tax will apply to all taxes, the opening sentence of subsection 3(a) refers only to "the millage rates for ad valorem taxes on real property." If subsection 3(a) is designed to locate the power to impose local taxes exclusively in the people, it should say so directly and unambiguously.
 6. Subsection 3(b) is confusing in several respects. First, although it dictates that all elections for the purposes set forth in subsection 3(a) "shall be held using the procedures now used for library millage elections," subsection 3(a) sets forth a variety of procedures for proposing changes in millage rates that do not conform to the procedures set forth in Ark. Const. amends. 30 and 38 for proposing millages to maintain and operate city and county libraries. Moreover, subsection 3(b) dictates that the election shall be one "called for that purpose" — i.e., a special election — whereas both of the above reference constitutional amendments provide that the issue may be submitted to the voters "at a general or special election." Finally, as I have previously advised you in Ark. Op. Att'y Gen. No. 99-263, you create an ambiguity in directing that the applicable procedures will be those "now used" in library millage elections:
 It is unclear what election procedures and petition formats will apply in the event that the current Amendments 30 and 38 are ever changed. Moreover, it is unclear precisely which portions of the procedures outlined in the current Amendments 30 and 38 are to apply, and what procedures will govern matters that are not adequately addressed by the current library election procedures. (For example, to whom are statewide election results to be certified?) In addition, no mention is made of Amendment 7, which currently governs the initiative process. It is unclear whether your proposed amendment intends to supersede that Amendment for millage elections, or whether Amendment 7 it is to fill in any gaps not otherwise addressed.
 7. Subsection 3(c) provides that the petitions "shall be in substantially the format now prescribed for library millage elections by this constitution, modified to reflect the taxing unit affected, and further modified by a statement setting forth the current tax rate, the proposed tax rate or rates, and the difference between the existing rate(s) and the proposed rate(s)." This provision is confusing in that it does not specify that a statement of the millage's purpose shall be substituted for the currently required statement that the tax proceeds shall be used for library purposes.
 8. Subsection 3(d) provides: "Notwithstanding the provisions of subsection (a), all proposed tax increases or decreases shall be presented to the voters at regularly scheduled statewide general elections, and not otherwise, after the holding of the first regularly scheduled statewide general election in which the tax might be increased or decreased, subsequent to the effective date of this amendment." This provision flatly contradicts the provision in subsection 3(b) directing that all changes in millage rates shall be by special elections.
 9. Subsection 3(e) provides: "Notwithstanding the provisions of subsection (a), nothing herein shall be construed to permit the impairment of the security of holders of any bonds lawfully secured by sales taxes or ad valorem property taxes." However, as I pointed out to you in Ark. Op. Att'y Gen. No. 99-263:
 A possible constitutional problem is the impairment of contracts with bondholders, who may have contractually relied on ad valorem taxes (rather than sales taxes) as security for their investments. Moreover, it is unclear from the language of your measure exactly who would have the authority to make the decision about the ability to repay bond debt and by what procedure such decision would be made, thus raising possible due process problems.
10. Subsection 3(e)(1) further provides:
 In case the ad valorem property tax remaining after the reduction or attempted abolition of an ad valorem property tax, pursuant to the provisions of this amendment or otherwise, is insufficient to pay all such obligations when due, the taxing authorities shall nevertheless impose and levy sales taxes or millage rates at a level sufficient to pay all lawfully contracted bonded indebtedness, and further rounded off to the next highest mill, provided that all such tax revenue shall be applied to the bonded indebtedness.
 Given that an ad valorem property tax is either abolished or not, your reference to an "attempted abolition" is highly confusing. You further fail to specify either which "taxing authorities" are charged with imposing the referenced taxes, how they shall determine the level of "sales taxes or millage rates" necessary to service and retire bonded indebtedness or how this tax burden is to be allocated. These omissions are inconsistent with your representation in section 9 that your proposed amendment "shall be self-executing." As I have previously advised you in Ark. Op. Att'y Gen. No. 99-197, if you intend to invest the assessor and collector of a county with the power to set a millage rate sufficient to pay bonded indebtedness, you must do so unambiguously.
11. Subsection 3(e)(2) provides:
 In the case of the abolition of all the property taxes within a county or taxing unit, the county assessor and collector shall nevertheless assess and collect sufficient taxes to establish trust funds adequate to pay off all lawful bonded indebtedness secured by ad valorem taxes, with the state or within the county or taxing unit affected. In case of abolition of all or nearly all the ad valorem property taxes within a county, the positions of tax assessor and tax collector shall be abolished or consolidated with other offices, as soon as practicable.
 This provision fails to specify how the referenced trust shall be established and administered and therefore conflicts with your representation in section 9 that your proposed amendment "shall be self-executing." The provision is further self-contradictory in that it both calls for the abolition of the positions of tax assessor and tax collector in the event property taxes are abolished and charges those officers with tax-collecting duties in the same event. The provision further fails to specify who shall collect property taxes if "nearly all" such taxes are abolished and the positions of tax assessor and tax collector are "abolished or consolidated with other offices."
 12. Section 4 provides in part: "All minimum millage requirements with this state, and especially the 25 mill minimum millage for public education, are hereby abolished and prohibited." This provision is confusing in that it is unclear how one can "abolish and prohibit" an entire category but "especially" part of that category.
 13. Section 4 further provides that all funds for primary and secondary education shall be distributed "equally on a per pupil basis, except as otherwise required by law superior to this constitution, provided that the funding of charter school or voucher students, if any, shall be governed by law or constitutional amendment, as the case may be." As I advised you in Ark. Op. Att'y Gen. No. 99-263, this passage leaves it unclear whether you intend currently existing funding formulas to apply to charter schools or whether you intend to subject such schools to some version of your equal-funding mandate. This provision is further confusing in proposing a procedure for funding a variety of student that currently does not even exist — namely, voucher students.
 14. Section 4 further provides in part: "The State may provide supplemental funding for handicapped students, provided that all handicapped students similarly situated are funded alike." This provision is confusing in that it fails to specify either how one determines whether handicapped students are "similarly situated" or who will make this determination.
 15. Section 5 is confusing in that it is unclear what you mean in directing that "[t]he State shall in no way punish the voters or government . . . for taxes of any kind or character . . . or reward any such voters or entities for enacting any tax or rate of tax, by any matching funds or any special privileges. . . ." As I advised you in Ark. Op. Att'y Gen. No. 99-263:
 Because these terms are inherently ambiguous, and are imbued with a connotation of motive, it is unclear exactly what actions these terms prohibit. Although mention is made of "matching funds," it is unclear whether the State may grant matching funds, if it does not do so out of motive to "reward" the voters of a given political subdivision. The converse question, of course, is whether the State may deny matching funds if it does not do so out of a motive to "punish" the voters.
 16. Section 7 provides: "The three (3) mill maximum for road or bridge construction or maintenance millages, set forth in Arkansas Constitution Amendment 61, is eliminated, provided that any millages exceeding three (3) mills must be approved by the electorate under the rules set forth herein." As reflected in my previous comments, "the rules set forth herein" are by no means clear. The section is further confusing in that it acknowledges a quorum court's continued power to tax up to three mills — a conclusion that would appear to conflict with the blanket restrictions on the power to tax suggested in subsection 3(a).
 17. Section 8 provides: "Nothing herein shall be deemed to supersede any abolition of the property tax by popular vote upon any initiative amendment, regardless of the respective votes upon the measures, except with respect to property taxes validly pledged as security for bonded indebtedness." This provision is confusing in that it is difficult to grasp how your proposed amendment, if adopted, could "supersede" an initiative amendment not yet in existence. If such a later amendment were proposed and adopted, the logical question would appear to be whether it superseded your amendment, not vice versa.
My office, in the certification of ballot titles and popular names, does not concern itself with the merits, philosophy, or ideology of proposed measures. I have no constitutional role in the shaping or drafting of such measures. My statutory mandate is embodied only in A.C.A. § 7-9-107
and my duty is to the electorate. I am not your counsel in this matter and cannot advise you as to the substance of your proposal.
At the same time, however, the Arkansas Supreme Court, through its decisions, has placed a practical duty on the Attorney General, in exercising his statutory duty, to include language in a ballot title about the effects of a proposed measure on current law. See, e.g., Finnv. McCuen, 303 Ark. 418, 793 S.W.2d 34 (1990). Furthermore, the Court has recently confirmed that a proposed amendment cannot be approved if "[t]he text of the proposed amendment itself contribute[s] to the confusion and disconnect between the language in the popular name and the ballot title and the language in the proposed measure." Roberts v. Priest, Case No. 00-485 (July 7, 2000). The Court concluded: "[I]nternal inconsistencies would inevitably lead to confusion in drafting a popular name and ballot title and to confusion in the ballot title itself." Id. Where the effects of a proposed measure on current law are unclear or ambiguous, it is impossible for me to perform my statutory duty to the satisfaction of the Arkansas Supreme Court without clarification of the ambiguities.
My statutory duty, under these circumstances, is to reject your proposed ballot title, stating my reasons therefor, and to instruct you to "redesign" the proposed measure and ballot title. See A.C.A. §7-9-107(c). You may, after clarification of the matter discussed above, resubmit your proposed amendment, along with a proposed popular name and ballot title, at your convenience. I anticipate, as noted above, that some changes or additions to your submitted ballot title may be necessary. I will be pleased to perform my statutory duties in this regard in a timely manner after resubmission.
Sincerely,
MARK PRYOR Attorney General
MP/cyh